FILED

APR 15 2011

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

**THE UNITED STATES OF AMERICA,**
  **ex rel.**
**BRADY FOLLIARD**
**10812 Avonlea Ridge Place**
**Damascus, Maryland 20872**

**BRINGING THIS ACTION ON**
**BEHALF OF THE UNITED STATES**
 **OF AMERICA**
**c/o Ronald C. Machen, Esquire**
**U.S. Attorney for the District of Columbia**
**555 4th Street, N. W.**
**Washington, D. C.  20001**

     **and**

**c/o Eric Holder, Esquire**
**Attorney General of the United States**
**Department of Justice**
**10th & Constitution Avenue, N. W.**
**Washington, D. C.  20530**

        **Plaintiffs**

    **v.**

**COMSTOR CORPORATION**
**14116 Newbrook Drive**
**Chantilly, VA 20151-2223**
**Serve: Registered Agent**
       **The Corporation Company**
       **1675 Broadway, Suite 1200**
       **Denver, CO 80202-4682**

    **and**

**WESTCON GROUP, INC.**
**520 White Plains Road, Floor 2**
**Tarrytown, NY 10591-5116**

**Serve: Registered Agent**

**CIVIL ACTION NO.**      # SEALED

### FILED UNDER SEAL

### COMPLAINT FOR VIOLATIONS
### OF FEDERAL FALSE CLAIMS ACT

### JURY TRIAL DEMAND

Case: 1:11-cv-00731
Assigned To : Sullivan, Emmet G.
Assign. Date : 4/15/2011
Description: General Civil



1

**CORPORATION SERVICE CO.**
**80 State Street**
**Albany, NY 12207-2543**

**Defendants**

## COMPLAINT

1.      This is an action to recover damages and civil penalties on behalf of the

United States of America arising from the false claims made by Comstor, Inc. and Westcon

Group, Inc. (hereinafter Defendants), in violation of the Federal False Claims Act, 31 U.S.C. §§

3729 et seq., as amended.

2.      The False Claims Act (hereinafter the Act), originally enacted in 1863

during the Civil War, was substantially amended by the False Claims Amendments Act of 1986

and signed into law on October 17, 1986.  Congress enacted these amendments to enhance the

Government's ability to recover losses sustained as a result of fraud against the United States and

to provide a private cause of action for the protection of employees who act in furtherance of the

purposes of the Act.  Congress acted after finding that fraud in federal programs and

procurement is pervasive and that the Act, which Congress characterized as the primary tool for

combating fraud in government contracting, was in need of modernization.

3.      The Act provides for any person who knowingly submits a false or

fraudulent claim to the Government for payment or approval is liable for a civil penalty of up to

$11,000 for each such claim, plus three times the amount of the damages sustained by the

Government, including attorneys' fees.  The Act allows any person having information regarding

a false or fraudulent claim against the Government to bring a private cause of action for himself

and on behalf of the Government and to share in any recovery.  The complaint is to be filed

under seal for sixty days (without service on the Defendants during such sixty-day period) to

2

enable the Government (a) to conduct its own investigation without the Defendants' knowledge, and (b) to determine whether to join the action.

4.   The FCA was further amended by the Fraud Enforcement Recovery Act ("FERA") passed by Congress and signed into law on May 20, 2009 for the express purpose of strengthening the tools available to combat fraud and to overturn judicial decisions that had weakened the False Claims Act.  Pub. L. No. 111-21, 123 Stat. 1617 (2009).

5.   While most of the new provisions apply only to claims after the effective date of the statute, Congress determined that 31 USC § 3729(a)(1)(B), which revised the former section designated as 31 USC § 3729(a)(2) pertaining to liability for false statements, "…shall take effect as if enacted on June 7, 2008, and shall apply to all claims . . . that are pending on or after that date."  4(f) of FERA, 123 Stat. at 1625 (see note following 31 USC § 3729).

6.   For claims prior to June 7, 2008, 31 USC § 3729(a)(2) holds liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement *to get a false or fraudulent claim paid or approved* by the Government."  *Id.* (emphasis added)

7.   For claims after June 7, 2008, 31 USC § 3729(a)(1)(B) holds liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement *material* to a false or fraudulent claim."  *Id.* (emphasis added)

8.   Based on these provisions, Plaintiff/Relator, Brady Folliard, seeks to recover damages and civil penalties arising from Defendants' improper pricing , material false statements and presentation of false claims to the United States Government in connection with the sale of products from non-designated countries to the United States Government in violation of the World Trade Organization – Government Procurement Act, the Trade Agreements Act, General

Services Administration contracts and policies, and applicable Federal Acquisition Regulations, including but not limited to "FAR Subpart 25.4 – Trade Agreements."

9.      Plaintiff Folliard has direct and independent knowledge that the Defendants are selling products to the United States Government that did not originate in designated countries under the Trade Agreements Act, and therefore are making material false statements and presenting false claims to the United States Government for payment.

## PARTIES

10.      Plaintiff Folliard is a resident of Damascus, Maryland.  At all times relevant herein, he has worked as a Strategic Account Executive for Insight Public Sector, selling information technology products and services to federal government agencies in Washington, D.C., Maryland and Virginia.  In this capacity, he gained direct and independent knowledge of the allegations contained in this Complaint.

11.      Defendant Comstor, Inc, maintained its corporate headquarters in Chantilly, VA, until recently, when it allowed its corporate status to lapse. It has always been a wholly owned subsidiary of Defendant Westcon Group, Inc. In 2010 Comstor shipped more than $1.8 Billion of Cisco products throughout the world.  Comstor is one of the primary distributors of Cisco products.  Over the last several years, Comstor has held a contract on Schedule 70 to sell Cisco products through the General Service Administration, Federal Supply Service.  Upon information and belief, almost all of Comstor's sales through its GSA Advantage, Schedule 70 contract involve the sales of Cisco products. The contract is designated GS35F4389G, and Comstor has enjoyed robust sales through this vehicle as reflected in the chart below:

|       | Comstor GSA Sales   |  |
|-------|---------------------|--|
| 2005  | $ 201,048,453.00    |  |
| 2006  | $ 256,464,243.00    |  |
| 2007  | $ 173,912,781.00    |  |
| 2008  | $   81,538,061.00   |  |
| 2009  | $     9,076,481.00  |  |
| 2011  | $     4,342,000.00  |  |
| Total | $ 726,382,019.00    |  |

12.     Defendant Westcon Group Inc. with headquarters in Tarrytown, NY has always been the parent company of Defendant Comstor, Inc.   Westcon Group is a wholly owned subsidiary of Datatec, Ltd of Johannesburg, South Africa.   Another wholly-owned division of Defendant Westcon Group, Inc known as Westcon Group of North America obtained a GSA Contract, GSA35F0563U, and has been selling Cisco products to government customers through this vehicle since 2008, as reflected in the chart below:

| Westcon GSA Sales |   |   |  |
|-------------------|---|---|--|
|                   |   |   |  |
| 2008              | $ |         3,550.00 |  |
| 2009              | $ |     6,504,540.00 |  |
| 2010              | $ |     4,659,587.00 |  |
| Total             | $ |    11,167,677.00 |  |

## The General Services Administration, Federal Supply Schedule

13.     The General Services Administration maintains and awards Federal Supply Schedule contracts, which are indefinite delivery, indefinite quantity contracts with commercial firms to provide supplies and services to government agencies throughout the world.   FAR Subpart 8.4 – Federal Supply Schedules.

14.     The Federal Supply Schedule is divided into several schedules, each of which is a vehicle to buy and sell a certain type of product. For example, Schedule 70 is devoted to "General Purpose Commercial Information Technology Equipment, Software, and Services."

Vendors that wish to offer IT supplies and services to the United States Government through the General Services Administration must apply and obtain a schedule contract under Schedule 70. See FAR Subpart 38.1 – Federal Supply Schedule Program.

15.    The General Services Administration negotiates each contract and attempts to achieve an agreement that achieves the best value for the United States Government, and complies with United States Government policy and procurement objectives. See FAR Subpart 8.1. et. seq.   Government contracting officers may purchase products through the GSAAdvantage web portal, and may assume that the product price is fair and reasonable.

16.    The General Services Administration specifically notifies all vendors and potential government customers that the Trade Agreements Act applies to all products and contracts awards under the Federal Supply Schedule. At its web site, the General Services Administration states: "The Trade Agreements Act (19 U.S.C. 2501, *et seq.*) is the enabling statute that implements numerous multilateral and bilateral international trade agreements and other trade initiatives. Since the estimated dollar value of each Schedule exceeds the established Trade Agreements Act (TAA) threshold, the TAA is applicable to all Schedules. In accordance with the TAA, only U.S.-made or designated country end products shall be offered and sold under Schedule contracts." See,http://www.gsa.gov/Portal/gsa/ep/programView.do?programId=15819&programPage=%2Fe p%2Fprogram%2FgsaOverview.jsp&P=FX7&pageTypeId=17112&ooid=8106&channelId=-24731.

17.    Under GSA procurement policies, vendors are not allowed to offer a product covered by the WTO GPA for sale on the FSS Schedule that does not originate in a designated

country, unless the contracting officer determines that an exception applies as defined by FAR

25.4.

      18.     The General Services Administration has consistently advised vendors of the need

to comply with the Trade Agreements Act.  In "GSA Steps," a newsletter published by the

General Services Administration and disseminated to vendors, the GSA commented in Issue No.

10, March 2006, at page 2:

> As a reminder, in solicitation provision FAR 52.212-3
> (f)(2), Offeror Representations and Certifications—
> Commercial Items, you must include a comprehensive list
> of those offered items that are obtained from sources other
> than the U.S. or designated country. In this same paragraph,
> your firm certifies to the accuracy of that representation.
> Any item not identified as from other than a designated
> country is considered to be compliant with the Trade
> Agreement clause of the contract.
>
> We urge you to review the products offered under your
> contract to ensure your company is compliant with the
> TAA requirements. You need to know where your contract
> products are produced or "substantially transformed" and
> compare that information to the countries listed
> in the various multilateral and bilateral international trade
> agreements and other trade initiatives as implemented by
> the Trade Agreements Act. If problems exist, we will work
> with you to address compliance issues; however, be aware
> that the contractor is ultimately responsible for compliance
> with the Trade Agreements Act in accordance with clause
> 52.225-5 Trade Agreements. As a reminder, in solicitation
> provision FAR 52.212-3 (f)(2), Offeror Representations
> and Certifications—Commercial Items, you must include a
> comprehensive list of those offered items that are obtained
> from sources other than the U.S. or designated country. In
> this same paragraph, your firm certifies to the accuracy of
> that representation. Any item not identified as from other
> than a designated country is considered to be compliant
> with the Trade Agreement clause of the contract.

19.   Prior to that in an earlier issue of "GSA Steps" (Issue No. 8, September 2005), the

GSA stated:

> Incorporated in all GSA Multiple Award Schedule
> contracts is FAR Clause 52.225-5, Trade Agreements. This
> clause is included in contract clause 52.212-3, Offeror
> Representations and Certifications—Commercial Items.
> When you signed your contract, you certified that all
> end products offered on your contract comply with the
> terms of the FAR 25.4, Trade Agreements. This applies to
> all of the products on your contract, whether you have one
> product or 10,000. The Trade Agreements Act applies to
> services, too.

20.   The September, 2005 issue of "GSA Steps" also explained how GSA

vendors should collect information from manufacturers about the country of origin.  GSA

advised vendors to keep a data base to track the source of each product. In addition, if a

vendor discovered a product from a non-designated country during a review or audit,

GSA urged the vendors to "immediately notify your Procuring Contracting Officer

(PCO) and request a modification to remove those products from your contract."

## The Trade Agreements Act

21.   Congress passed the Trade Agreements Act of 1979, 19 U.S.C. § 2501, *et. seq.*,

for the reasons articulated at §2502, which include the approval and implementation of "trade

agreements negotiated under the Trade Act of 1974." *Id.* at § 2502 (1).   Congress and the

President, by virtue of this legislation, endorsed and accepted certain trade agreements and

mechanisms to implement these agreements.[1] The covered agreements are listed at 19 U.S.C §

---

[1]      "In accordance with the provisions of section 2112 and 2191 of this title, the Congress approves the trade
agreements described in subsection (c) of this section submitted to the Congress on June 19, 1979, and the
statements of administrative action proposed to implement such trade agreements submitted to Congress on that
date. " 19. U.S.C. Section 2503 (a) (1979).

2503 (c). Subsection ( c ) (3) applies  the Trade Agreements Act  to the Agreement on

Government Procurement. 19 U.S.C. § 2503 (c) (3) (1979).

22.     Under the terms of the World Trade Organization Government Procurement

Agreement, the signatory countries have agreed to allow industries from the member countries to

freely participate in government procurement on equal footing with domestic companies.  For

example, under this agreement industries based in Great Britain are allowed to freely compete

for federal government contracts in the United States of America on an equal footing with United

States domestic companies. Similarly, companies from the United States of America can freely

compete for contracts issued by Great Britain.

23.     The United States has determined that this agreement shall apply to procurement

at most of its agencies, including but not limited to the General Service Administration

(hereinafter GSA), the National Aeronautics Space Administration, Department of Health and

Human Services, Department of Justice, Department of State, Department of Defense,

Department of Veterans Affairs, and Department of Agriculture.

24.     All of the contracts executed by the Defendants under the General Service

Administration Federal Supply Service, Multiple Awards Program and under the NASA SEWP

program are covered by the Trade Agreements Act, and the United States Government is

prohibited from purchasing end-products that originate in non-designated countries, except under

limited circumstances.

25.     FAR 25.11 (c )(1) states that clause 52.225-5 shall be inserted in any "solicitation

or contract valued at $175,000 or more, if the acquisition is covered by the WTP GPA."

Consistent with this, Defendants' contracts incorporated FAR Clause 52.225-5, entitled "Trade

Agreements" and required each Defendant to execute the FAR 52-225-6 Trade Agreements Certificate.

26.     The WTO GPA does not apply to all end products from foreign countries. Dollar thresholds, based upon the total dollar value of the procurement, were established to mark the point at which the WTO GPA restrictions would begin to apply. *See*, FAR Subpart 25.402 ("The value of the acquisition is a determining factor in the applicability of trade agreements.")

27.     To decide whether eligible products from WTO GPA countries are entitled to non-discriminatory treatment, contracting officers must apply FAR Subparts 25.402 and 25.403 to establish the threshold. The threshold is adjusted every two years. In 2007, the TAA threshold for WTO GPA products was $193,000.00. It was raised to $194,000.00 on January 15, 2009. 74 F.R. 2745 (January 15, 2009).

28.     To calculate the WTO GPA threshold, contracting officers must apply FAR Subpart 25.403 (b) (3). If in any given 12 month period, "recurring or multiple awards of the same type of products" are expected then the threshold is computed by calculating the total of the projected annual awards. FAR 25.403 (b)(3). Simply put, it is based upon the projected sales for the calendar year.

29.     For these defendants, sellers of information technology equipment and services, the contract only deals in "the same type of product" because the contract is by definition a procurement vehicle for information technology services and supplies. In addition, there is no annual period when any of the defendants had sales less than $193,000.00, and therefore the TAA threshold was always met, and the TAA applied to these defendants at all times.

30.     FAR 52.225-5 defines critical terms such as "Designated Country" and it specifically identifies the countries that are recognized as such. FAR 52.225-5 (a). By

exclusion, the clause also identifies the countries that are not considered to be "designated," by

not including them on the list.  As the People's Republic of China, Malaysia, Thailand, and the

Philippines fall into the latter category, they are not  designated countries.  FAR 52.225-5 also

states that the "designated country end product" means a product produced in one of the listed

countries.  *Id*

     31.    FAR 52.225-5 states that in most instances, the contractor is prohibited from

*delivering* products under the contract that are not US made or from designated countries.  FAR

52.225-5 (b)   [Emphasis Added] At subsection (b), the clause asserts:

> The Contracting Officer has determined that the WTO GPA
> and FTAs apply to this acquisition. Unless otherwise
> specified, these trade agreements apply to all items in the
> Schedule. *The Contractor shall deliver under this contract
> only U.S.-made or designated country end products except
> to the extent that in its offer, it specified the delivery of
> other end products in the provision entitled "Trade
> Agreements Certificate." Id.* at subsection (b). [*Emphasis*
> Added.]

     32.    The Trade Agreements Certificate is FAR 52.225-6, which by the terms of FAR

25.11 (c) (2) is required to be completed each time that FAR 52.225-5 is used.  FAR 25.1101

(c)(2).  This certificate has two parts, Subsection (a) and Subsection (b). Contractors or vendors

executing FAR 52.225-6 (a), "certif[y] that each end product, except those listed in paragraph (b)

of this provision, is a U.S.-made or designated country end product as defined in the clause of

this solicitation entitled 'Trade Agreements.'" FAR 52.225-6 (a).   Under subsection (b), the

contractor must list with particularity all of those end products that *are not* U.S. –made and/or

were not produced in a designated country.  See, FAR 52.225-6 (b). [Emphasis added]

     33.    Information about the country of origin of the end product is material to the

contracting official because he does not have the authority to purchase a WTO-GPA end product

that is not U.S.-made or from a designated country except under extremely limited circumstances. Moreover, at all times relevant herein, the FAR Clause 52-225-5, has been included in the contracts between the United States and the Defendants, and Defendants have certified compliance as a condition of doing business with the Government,

34. FAR Subpart 25.5 describes the process for contracting officers to use to evaluate foreign goods. FAR 25.502(b) specifically addresses the procedures for a contracting officer to follow when dealing with acquisitions covered by the WTO GPA. FAR 25.502 (b). Contracting officers must "consider only offers of U.S.-made or designated country end products, unless no offers of such end products were received." FAR 25.502 (b)(1). Once the contracting authority identifies the eligible offers, he must give equal consideration to end-products from the U.S. and designated countries and make the award based upon the lowest price. FAR 25.502 (b)(2). Only when there are no offers of U.S-made or designated country made end products, can the contracting officer then buy the foreign products. FAR 25.502 (b)(3).

35. Read together, FAR 52.225-5(b) and FAR 25.502 (b) severely reduce the likelihood of any foreign product from a non-designated country reaching a federal facility. If the vendor does not list the foreign item as originating in a non-designated country pursuant to FAR 52.225-5 (b) and FAR 52-225-6 (b), the vendor cannot "deliver" the product to the Government. The use of the word "deliver" suggests that even if a contracting officer mistakenly purchases such an item, the vendor has an independent obligation not to deliver it, if the vendor failed to properly identify the product and its country of origin under FAR 52.225-5 (b) and FAR 52-225-6 (b).

36. The contracting officer can only buy the end product from the non-designated country if there are *no* available products from the U.S or a designated country. FAR 25.502 (b)(2). [Emphasis added]

**Violation of the Trade Agreements Act**

37.     Plaintiff Folliard is a Strategic Account Executive employed by Insight Public Sector, 4510 Daly Drive, Suite 300, Chantilly, VA 20151.  In this capacity he sells information technology products, services, and systems to federal agencies.

38.     Insight Public Sector is one of several companies that provide this service.  In the industry, Insight Public Sector is known as a "VAR", which stands for "Value Added Reseller".

39.     Value Added Resellers are businesses that combine, configure and sell computer products manufactured by other companies in specifically designed configurations to meet the needs of their customers.  Value Added Resellers do not manufacture any product.

40.     Essentially, Value Added Resellers are middle-men in the supply chain between the technology manufacturers and their ultimate customers.

41.     Value Added Resellers make their profits on the difference between the discount cost of the product to them and the marked-up price paid by the ultimate customer.

42.     Both the manufacturer and the ultimate customer benefit from the presence of the VAR.

43.     Folliard, as a regular part of his duties, sells his services and products through the Scientific, Engineering, Workstation Procurement (SEWP) contract[2], administered by NASA, and the FSS Multiple Awards Schedule of the GSA, specifically Schedule 70.  The Trade Agreements Act ("TAA") applies to sales under both SEWP and Schedule 70.

44.     Pursuant to the TAA, the United States Government has determined that it will not purchase products from countries, with which it has not negotiated a Trade Agreement.  For

---

[2]   In SEWP IV, the meaning of the acronym changed to Solutions for Enterprise Wide Procurement.

example, China has not completed Trade Agreements with the United States, and therefore under the TAA the United States Government will not purchase end products manufactured in China.

45.     Vendors, wishing to sell products to the United States Government, certify that the products that they offer for sale to the United States Government are in compliance with the TAA. In short, vendors promise not to sell products to the Government that were produced in China.

46.     Because many Information Technology components are manufactured in China, Account Executives, like Folliard, should review their products for sale to the Government to ensure compliance. Unfortunately, many do not.

47.     Folliard has become aware that non-compliant products made by Cisco, are being offered for sale to the government by several vendors. He obtained this information from two credible sources. First, he received an e-mail from a Comstor representative, who, based upon its close relationship with Cisco, had access to the country of origin information regarding several Cisco products. This representative specifically identified several products that were not end-products from designated countries as defined by the TAA.  Second, while working on a deal, in partnership with other vendors, he learned of several products that were not compliant. Comparing these products to those being offered for sale, he was able to identify several companies that were violating the False Claims Act and the specific terms of the GSA contract by selling these products to the government. The following documents provided Folliard with direct and independent knowledge of these practices:

      a.   Comstor Quote # 080109-1 dated 1/9/08. It lists 60 Cisco products. Those identified as "open market" are primarily end-products from non-designated countries. (Exhibit A)

b.  E-mail dated 1/7/08 from Steve Marcellino to Brady Folliard. This e-mails specifically identifies products as "not trade compliant for GSA – open market." (Exhibit B)

c.  Undated Letter with proposal from Carlos Cantarilho to Ruben Mendez regarding Solicitation GS04TE06CM06, Mod 3. This document lists several Cisco products. Those with a numerical quantity indicated in the "GFE" column are primarily non-compliant. (Exhibit C)

47.  To investigate this matter, further, Plaintiff issued a FOIA Request to the General Services Administration to obtain a list of the product and transaction information about the Cisco products sold through GSA Advantage Order web-portal regarding all vendors that sold Cisco products through the on-line data system from 2003 through January 2011.  (Exhibit D)

48.  GSA responded to this request by sending an Excel Spreadsheet entitled "1886427 Adv Sales for Cisco 2003 – Jan 19 2011."  (Exhibit E) This spreadsheet contained several Columns of information: Column A (mfr-name); Column B (mfr_part_number); Column C (Date); Column D (Purchase_number), Column E (Agency_name) Column F (vendor_name); Column G (unit_price); Column H (quantity); Column I (extended_price). (A sample of the type of information on this spreadsheet is attached as Exhibit F)

49.  Exhibit F does not contain any information about the country of origin of the products, nor does it contain any allegations or transactions of fraud.

50.  Based upon his work as a senior sales executive, Folliard possessed three Cisco Country of Origin Charts that list the product numbers and country of origin for each of thousands of Cisco Products.  These charts are routinely provided to Government vendors so that they can check the Country of Origin to comply with government regulations in selling products

to the government. (A sample of the type of information contained in these charts is attached as Exhibit G, H, and I) Comparing the sales data with the Country of Origin Charts in his possession, it was evident that vendors, including the Defendants, were selling products to the United States Government that did not originate in a designated country.

51.     To determine the extent of these violations, the GSA Sales data from 2003 through 2011 and the Cisco Country of Origin Charts were sent to Methods Consultants of Ann Arbor to analyze and determine the extent to which the sales reflected any sales of items that did not originate in a non-designated country.

52.     Jeremy Albright, PhD of Methods Consultants issued his report on April 11, 2011. (hereinafter MC/A2 Report) (See Exhibit J). The MC/A2 Report made several critical conclusions about the Cisco Sales reflected in this sample:

      a.   From 2003 through 2011, there were 3,817 transactions in the GSA database that involved CISCO products manufactured in non-designated countries.  The total number of items purchased in these transactions was 19,823, with a combined value of $10,838,032.79.  Exhibit J, page 2

      b.   The non-compliant items represented 52.38% of all items listed in the GSA sales database and 90.01% of all transactions where the part number successfully matched to CISCO's country of origin (COO) database. Exhibit J, page 2.

53.     The MC/A2 report made several critical conclusions about Comstor,  and stated, "Comstor was responsible for 78 transactions involving non-designated countries, selling a total of 342 items whose combined value was $374,746.89." The report also stated,  " This represented 29.69% of all items sold by Comstor and 51.04% of all transactions where the part number successfully matched to the CISCO COO database."  Exhibit J, page 2.

54.     Subsequently, Professor Rohan Williamson of the McDonough Business School reviewed the MC/A2 Report and reached the following conclusions about Comstor's rate of violations under the TAA in a report dated April 13, 2011. Exhibit K

    a.   There are substantial violations of the TAA by Comstor. Exhibit K, page 11

    b.   Overall the rate of compliance is about the level one would expect if the firm was purposefully violating the TAA. Exhibit K, page 11

    c.   The aggregated sales from non-designated countries are over $444 million for Comstor. Exhibit K, page 11

    d.   Based on transactions, the minimum damage for Comstor is potentially over $1 billion.  Exhibit K, page 11.

55.     The Comstor GSA Contract for Contract Number GS35F4389G, that covered the period from October 23, 2996 through November 30, 2010, explicitly stated that under the terms of the contracts the Trade Agreements Act of 1979 applied and required that all items be "U.S. made end products, designated country end products, Caribbean Basin country end products, Canadian end products, or Mexican end products as defined in the Trade Agreements Act of 1979."  See Paragraph 8 of the attached contract. (Exhibit L)

56.     Comstor fully understood its obligation under the Trade Agreements Act.  In more than one video available on its website, Comstor touted its ability to bring compliant products to the Federal Customers. Stu Schwartzreich, Director Comstor Federal, in a video created on December 17, 2009 states:

> "We bring a couple of additional resources to our GSA strategy. The first is obviously gray market is a problem in the federal market-place. So with our TAA compliance and verification process, we ensure that only authorized, genuine, and certified Cisco products are delivered to the

federal government. If for no other reason, that's a real plus for our contract vehicle. Then we bring in the ability with our secure supply chain to ensure that we get the product there efficiently and correctly for the federal end user. So there's a number of additional benefits besides just price and availability. It's these other resources that we bring to the table which make the contract more rich and rewarding for the federal end-user." (Video 57 second to 1:33)

http://www.youtube.com/watch?v=eZ70cgjOZMc

57.    Comstor, contrary to its bold assertions, has been knowingly delivering products to the United States Government that do not originate in designate countries.

58.    Specific details about sales of Cisco products by Comstor that did comply with the Trade Agreements Act are included in the attached chart (Exhibit M)   All of these sales represent products that did not originate in a designated country.  The chart provides the Cisco product number of the item sold, the date of the sale, the price of the product, and the number of items purchased, and the agency that purchased the products.

59.    The following table summarizes the Comstor sale of Cisco products that did not originate in designated countries as analyzed by both MC/A2 and Professor Williamson:

| Year | Transactions on GSA Advantage | Items Purchased from GSA Advantage | Value of Items Purchased on GSA Advantage | Transactions from NDCs | Items Purchased from NDCs | Value of Items Purchased from NDCs |
|---|---|---|---|---|---|---|
| 2004 | 35 | 74 | $91,110.73 | 5 | 20 | $38,113.84 |
| 2005 | 60 | 165 | $88,722.01 | 7 | 12 | $10,290.14 |
| 2006 | 58 | 164 | $116,899.37 | 7 | 23 | $24,212.57 |
| 2007 | 58 | 235 | $87,619.25 | 19 | 75 | $25,037.13 |
| 2008 | 14 | 61 | $71,450.53 | 2 | 2 | $14,243.32 |
| 2009 | 35 | 204 | $152,897.07 | 14 | 101 | $109,552.80 |

| | | | | | |
|---|---|---|---|---|---|
| 2010 | 60 | 249 | $310,066.98 | 24 | 109 | $153,297.09 |
| **Total** | **320** | **1,152** | **$918,765.94** | **78** | **342** | **$374,746.89** |

Exhibit K, page 18.

60.     Single damages from this sample, which is less that 1% of the total Comstor Sales

of GSA products amounts to $374,746.00, and involves 78 transactions and 342 items that did

not originate in designated countries as required by the Trade Agreements Act.

61.     Professor Williamson concluded that the GSA Advantage sample and the rate of

product sales that did not originate in a designated country could be legitimately applied to the

entire domain of GSA Cisco sales by Comstor. See page 13 of Exhibit K. He stated, "The

general sampling approach used thus far assumes that the GSA Advantage portal is a sample of

the full GSA sales of Comstor and other firms.  As discussed above this approach is widely used

and the potential biases have been discussed.  Since the GSA advantage sales are assumed to be a

representative sample of all GSA sales, we can aggregate to the full GSA sales of Comstor.  "

62.     Professor Williamson created a chart that showed the extrapolated total value of

the Cisco products sold by Comstor that did not originate in designated countries:

| Year of Transaction | Total Value of Comstor products sold to GSA | Total Value of Items Purchased with Valid Part Numbers – GSA Advantage | Total Value of Items purchased from NDCs | Value of all GSA products to GSA Advantage products sold factor | Extrapolated value of products from NDCs |
|---|---|---|---|---|---|
| 2004 | $ 47,918,258.33 | $ 42,345.58 | $ 38,113.84 | 1,131.6 | $ 43,129,621.34 |
| 2005 | $ 201,048,453.00 | $ 21,694.56 | $ 10,290.14 | 9,267.2 | $ 95,361,082.60 |
| 2006 | $ 256,464,243.00 | $ 32,739.58 | $ 24,212.57 | 7,833.5 | $ 189,668,237.53 |
| 2007 | $ 173,912,781.00 | $ 53,964.61 | $ 25,037.13 | 3,222.7 | $ 80,687,637.82 |

| 2008 | $ 81,541,611.00 | $ 61,095.75 | $ 14,243.32 | 1,334.7 | S 19,009,886.27 |
| 2009 | $ 15,581,021.00 | $ 149,699.61 | $ 109,552.80 | 104.1 | S 11,402,464.42 |
| 2010 | $ 9,001,587.00 | $ 290,221.57 | $ 153,297.09 | 31.0 | S 4,754,702.05 |
| **Total** | **$ 785,467,954.33** | **$ 651,761.26** | **$ 374,746.89** | **1,205.1** | **$ 444,013,632.03** |

63.   According to Professor Williamson, based upon extrapolation, Comstor sold 572,275 Cisco Products from non-designated countries in 191,465 transactions between 2003 and 2010.

| Year of Transaction | Extrapolated Number of Transactions | Extrapolated number of Items | *Extrapolated Number of Transactions from NDCs* | *Extrapolated Number of Items from NDCs* |
|---|---|---|---|---|
| 2004 | 6,790 | 38,919 | *5,658* | *22,632* |
| 2005 | 120,474 | 373,898 | *64,871* | *111,207* |
| 2006 | 117,502 | 359,798 | *54,834* | *180,170* |
| 2007 | 93,459 | 466,444 | *61,232* | *241,704* |
| 2008 | 9,343 | 69,615 | *2,669* | *2,669* |
| 2009 | 2,706 | 20,789 | *1,457* | *10,512* |
| 2010 | 1,396 | 7,229 | *744* | *3,381* |
| **Total** | **351,669** | **1,336,692** | ***191,465*** | ***572,275*** |

Exhibit K, page 22.

64.   Under the False Claims Act, the Government is entitled to recover compensatory damages of up to 3 times single damages.  In this case, single damages for total GSA sales by Comstor of Cisco products from non-designated countries are likely to be $444,013,632 between 2003 and 2010.

65.   Under the False Claims Act, the Government is entitled to recover statutory damages by multiplying between $5,000 and $11,000 times the number of claims. Using the

number of transactions as the number of false claims, then minimal statutory damages for the total GSA sales by Comstor of Cisco Products from non-designated countries in this case amounts to $957,325,000.00.

66.     Defendants knowingly listed the above  Cisco products on the GSA portals  as having originated in a designated country, when in fact, these products originated in non-designated countries like China and Malaysia.  Each product listed on the GSA Schedule must first be identified as having originated in a designated country. The fact that these products were available for sale on the GSA web-portal demonstrates that representatives of Defendants falsely represented that many of the products listed, see Exhibit M, originated in designated countries when they did not.

67.     The Trade Agreements Certificate is FAR 52.225-6, which by the terms of FAR 25.11 (c) (2) is required to be completed each time that FAR 52.225-5 is used.   FAR 52.225-5 should have been a part of each of the Agreements between the United States Government and the defendants and therefore, the FAR 52.225-6, Trade Agreements Certificate, was required to be completed by Defendants.

68.     Because Defendants  did not properly complete the Trade Agreements Certificate, FAR 52.225-6,  and specify the products from non-designated countries that it intended to offer under the contract,  Defendants were contractually bound to only offer products from designated countries. ("The Contractor shall deliver under this contract only U.S. –made or designated end products except to the extent that, in its offer, it specified delivery of other end products in the provision entitled 'Trade Agreements Certificate.'")

69.     Defendants  sold these products from non-designated countries to the Government and presented false claims for the payment for the sale of these items.

## COUNT I
### *(False Claims Act 31 U.S.C. §3729 (a)(1))*

70.     Plaintiff Folliard alleges and incorporates by reference the allegations made in paragraphs 1 through 69 of this Complaint.

71.     This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729-32.

72.     By virtue of the acts described above, the Defendants knowingly submitted, and caused to be submitted, false or fraudulent claims for payment and reimbursement by the United States Government *before May 20, 2009*, and the United States, unaware of the falsity of the records, statements and/or claims made by the Defendants and in reliance on the accuracy thereof, paid for aforementioned false claims because the Defendants intentionally or with gross disregard for the truth sold products to the Government that did not originate in the United States or a designated country.

73.     As set forth in the preceding paragraphs, Defendants violated 31 U.S.C. § 3729 and has thereby damaged and continues to damage the United States Government by its actions in an amount to be determined at trial.

## COUNT II
### *(False Claims Act 31 U.S.C. §3729 (a)(1) (A))*

74.     Plaintiff Folliard alleges and incorporates by reference the allegations made in paragraphs 1 through 73 of this Complaint.

75.     This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729-32.

76.     By virtue of the acts described above, the Defendants knowingly submitted, and caused to be submitted, false or fraudulent claims for payment and reimbursement by the United

States Government *after May 20, 2009*, and the United States, unaware of the falsity of the records, statements and/or claims made by the Defendants and in reliance on the accuracy thereof, paid for aforementioned false claims because the Defendants intentionally or with gross disregard for the truth sold products to the Government that did not originate in the United States or a designated country.

77.     As set forth in the preceding paragraphs, Defendants violated 31 U.S.C. § 3729 and has thereby damaged and continues to damage the United States Government by its actions in an amount to be determined at trial.


## COUNT III
### *(False Claims Act, 31 U.S.C. § 3729 (a)(2))*

78.     Plaintiff Folliard realleges  and incorporates by reference the allegations made in Paragraphs 1 through 77 of this Complaint.

79.     This is a claim for treble damages and for forfeitures under the False Claims Act, 31 U.S.C. §§ 3729-3

80.     By virtue of the acts described above, the Defendants defrauded the United States by failing to adhere to the Trade Agreements Act clauses.

81.     By virtue of the acts described above, the Defendants knowingly made, used or caused to be made or used, material false statements to obtain Federal Government payment for false or fraudulent claims because the Defendants falsely represented the country of origin of the products that it sold and offered for sale to the United States Government *before June 7, 2008 i*n violation of the Trade Agreements Act.

82.     The United States Government relied upon these statements and has been damaged and continues to be damaged in substantial amounts.  The exact amount of the damage is to be determined at trial.

### COUNT IV
*(False Claims Act, 31 U.S.C. § 3729 (a)(1)(B))*

83.     Plaintiff Folliard realleges  and incorporates by reference the allegations made in Paragraphs 1 through 82 of this Complaint.

84.     This is a claim for treble damages and for forfeitures under the False Claims Act, 31 U.S.C. §§ 3729-32.

85.     By virtue of the acts described above, the Defendants defrauded the United States by failing to adhere to the Trade Agreements Act clauses.

86.     By virtue of the acts described above, the Defendants knowingly made, used or caused to be made or used, material false statements to obtain Federal Government payment for false or fraudulent claims because the Defendants falsely represented the country of origin of the products that it sold and offered for sale to the United States Government *after June 7, 2008* in violation of the Trade Agreements Act.

87.     The United States Government relied upon these false statements and has been damaged and continues to be damaged in substantial amounts.  The exact amount of the damage is to be determined at trial.

### PRAYER

WHEREFORE, Plaintiff/Relator prays for judgment against Defendants as follows:

1.     That Defendants cease and desist from violating 31 U.S.C. § 3729 et seq.

2.     That this Court enter judgment against the Defendants in an amount equal

to three times the amount of damages the United States Government has sustained because of Defendant's actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. § 3729 et seq.;

3.     That Plaintiff/Relator be awarded the maximum amount allowed pursuant to §3729 (d) of the False Claims Act;

4.     That Plaintiff/Relator be awarded all costs and expenses of this action, including attorney's fees.

Respectfully submitted,

MCKNIGHT & KENNEDY, LLC


BY: *H. Vincent McKnight*
H. Vincent McKnight, Jr.
D.C. Bar No. 293811
Altomease R. Kennedy
D.C. Bar No. 229237
8601 Georgia Avenue
Suite 1010
Silver Spring, MD 20910
(301) 565-5281


Counsel for Plaintiff demands a trial by jury.

*H. Vincent McKnight*
H. Vincent McKnight

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Complaint , Filed Under Seal, was sent by Federal Express, postage prepaid, this 15th day of April 2011, to:

Ronald C. Machen, Esquire
U.S. Attorney for the District
 of Columbia
555 Fourth Street, N. W.
Washington, D. C.  20001

Eric Holder, Esquire
Attorney General of the United States
Department of Justice
10th & Constitution Avenue, N. W.
Washington, D. C.  20530

H. Vincent McKnight