# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE UNITED STATES OF AMERICA, *ex rel.* BRADY FOLLIARD, | |
| Plaintiff, | Civil Action No. 11-731 (BAH) |
| v. | Chief Judge Beryl A. Howell |
| COMSTOR CORPORATION, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

The relator, Brady Folliard, initiated this lawsuit, pursuant to the *qui tam* provision of the False Claims Act ("FCA"), 31 U.S.C. § 3730(b)(1), seven years ago, against two defendants, Westcon Group, Inc. ("Westcon") and one of its wholly-owned subsidiaries, Comstor Corporation ("Comstor"), alleging that the defendants, along with another wholly-owned subsidiary of Westcon, Westcon North America Inc. ("Westcon NA"), sold to the U.S. government "thousands of" mostly unspecified products made by Cisco Systems, Inc. ("Cisco") that originated in non-designated countries in violation of the Trade Agreement Act ("TAA"), 19 U.S.C. §§ 2501 *et seq.* Rel.'s Third Am. Compl. ("TAC") ¶¶ 1–2, 143, ECF No. 65. These allegations were initially predicated on the relator's "direct and independent knowledge" gained from his position as a Strategic Account Executive for Insight Public Sector Inc. ("Insight"), a company that partnered with the defendants "on multiple sales." Compl. ¶ 10, ECF No. 1; TAC ¶ 5. After almost five years of investigation and the defendants' production of data documenting over $123 million in sales, as well as 49 charts, each of which "encompasses hundreds of pages" of Cisco's product information, *see* TAC ¶¶ 137–38; *see also id.*, Ex. 17–17F, Defs.' Produced Sales Data, ECF Nos. 65-19–24; *id.*, Ex. 18, Cisco Production Cover Letter (dated Apr. 19,

2013) ("Cisco Production Letter"), ECF No. 65-25, the United States declined to intervene, *see* U.S.'s Not. Election Decline Intervention ("U.S.'s Not.") at 1, ECF No. 43. The operative Third Amended Complaint seeks treble damages and civil penalties of "not less than $5,500 and not more than $11,000 for each violation of" the FCA by the defendants "from 2005 and continuing to the present." TAC ¶¶ 1, 182–99; *id.* 47–48. The defendants have moved to dismiss the Relator's Third Amended Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), on grounds that: (1) the "claims are based on, and substantially similar to, prior public disclosures," for which the relator is not an "original source," and therefore are barred, under 31 U.S.C. § 3730(e)(4), Defs.' Mot. Dismiss Rel.'s TAC ("Defs.' Mot.") at 1–2, ECF No. 67; and (2) the Third Amended Complaint fails to state a plausible claim for relief under the FCA or satisfy the particularity requirements of Federal Rule of Civil Procedure 9(b), *id.* at 2–3. For the reasons set forth below, the defendants' motion is granted, and this case is dismissed.[1]

# I.    BACKGROUND

The relator alleges that the defendants submitted false claims and false statements to the U.S. government under two Federal Supply Schedule ("FSS") contracts awarded to the defendants by the General Service Administration ("GSA") authorizing the defendants' sale to the federal government of information technology ("IT") products. TAC ¶¶ 3, 7, 10, 37. Summarized below is the relevant factual history, as alleged in the Third Amended Complaint and its twenty attachments, followed by the procedural history of this litigation.

## A.    Factual History

### 1.    *The Defendants' Business with the Federal Government*

---

[1] The defendants have requested oral argument on the pending motion, Defs.' Mot. at 4, but given the sufficiency of the parties' written submissions to resolve the pending motion, this request is denied. *See* LCvR 7(f) (allowance of oral hearing is "within the discretion of the Court").

For over two decades, the defendants have used two FSS contracts to offer for sale to the federal government "thousands of" Cisco products. *Id.* ¶¶ 7–11, 143. These products are largely unidentified in the Third Amended Complaint, except for nineteen "representative" examples of purchase orders, reflecting 46 transactions for items delivered to the federal government between September 29, 2008, and December 12, 2013. *Id.* ¶¶ 116–35 (discussing two purchase orders), 145–81 (discussing seventeen additional purchase orders).[2] The first FSS contract at issue, designated as GS-35F-4389G, was entered in 1996, by defendant Comstor, which is "one of the primary distributors of Cisco products." *Id.* ¶ 6, 41; *id.*, Ex. 1, Comstor Contract GS-35F-4389G ("Comstor Contract"), ECF No. 65-2. Indeed, "almost all of Comstor's sales through" this contract "involve[d] Cisco products." *Id.* ¶¶ 7–8. Prior to March 17, 2010, Comstor "was the sole authorized FSS contract holder for Cisco products," and, thus, "any GSA sales of Cisco products had to come from Comstor directly" or from a smaller vendor with which Comstor had partnered, or else "an unauthorized source." *Id.* ¶¶ 45, 55. In 2010, Comstor "ceased to exist and simply became Westcon." *Id.* ¶ 45 n.6.

The second FSS contract at issue, designated as GS-35F-0563U, has been held by Westcon NA since 2008, and is the vehicle through which the defendants presently sell IT products, including Cisco products, either directly or through partners. *Id.* ¶¶ 10–11, 45; *see also id.*, Ex. 2, Westcon Contract GS-35F-0563U ("Westcon Contract"), ECF No. 65-3. Based on data from 2006 through 2012 for both contracts, nearly $500 million of the defendants' $600

<hr />

[2]    Attached to the Third Amended Complaint are approximately 25 separate documents, totaling almost 1000 pages, which documents include  purchase orders and apparently related COO information with obscure product codes. *See, e.g.*, TAC, Ex. 14, Purchase Order (dated Sept. 24, 2010), ECF No. 65-15; *id.*, Ex. 16, Purchase Order (dated July 28, 2011), ECF No. 65-17); *id.* Ex. 19, Source Documents ("Rel.'s Sales Source Docs."), ECF No. 65-26; *id.*, Ex. 20, Source Country of Origin Documents ("Rel.'s COO Source Docs."), ECF No. 65-27. These voluminous exhibits require considerable digging and cross-referencing to be minimally intelligible.  Nonetheless, the parties appear to agree that, in the midst of this exhibit mass, are purchase orders for 46 transactions. *See* Rel.'s Opp'n Defs.' Mot. Dismiss ("Rel.'s Opp'n") at 26, ECF No. 69; Defs.' Reply Supp. Mot. Dismiss ("Defs.' Reply") at 10 n.6, ECF No. 71.

million dollars in GSA sales during the time period were attributable to Cisco products. *Id.* ¶ 12.

As noted, those products are not identified in the Third Amended Complaint, but the

"representative" examples include computer related materials and supplies, such as flash drives,

routers, and switch ports. *See id.*, Ex. 19, Source Documents ("Rel.'s Sales Source Docs."), ECF

No. 65-26; *id.,* Ex. 20, Source Country-of-Origin Documents ("Rel.'s COO Source Docs."), ECF

No. 65-27.

The defendants' contracts are governed by the TAA, 19 U.S.C. §§ 2501 *et seq.*, which

"implements numerous multilateral and bilateral international trade agreements and other trade

initiatives." TAC ¶ 58; *see also* Wescon Contract at 9 (requiring compliance with TAA);

Comstor Contract at 6 (same). Under the TAA and its implementing regulations, the Federal

Acquisition Regulations ("FAR"), items sold through GSA FSS contracts must be "U.S.-made or

designated country end products." TAC ¶ 58. The FAR defines "end product" as "those articles,

materials, and supplies to be acquired under the contract for public use." *Id.* ¶ 59 (quoting FAR

52.225-5(a)). The FAR also provides a list of designated countries, including signatories to the

World Trade Organization ("WTO") Government Procurement Agreement ("GPA") and to

bilateral trade agreements with the U.S. *See id.* ¶¶ 75–76 (citing FAR 52.225-5(a)). Countries

such as China and Malaysia, which are not on the FAR list, are identified by exclusion as non-

designated countries. *Id.* ¶¶ 75–76. For the purposes of the TAA, an end product is "U.S.-made"

or from a "designated country" when the item was completely manufactured, grown, or

produced, or else "substantially transformed" in the U.S. or a designated country. *Id.* ¶ 77 (citing

19 U.S.C. § 2518(4)(B); 19 C.F.R. § 177.22(a)).

The FAR imposes on vendors, such as the defendants, a general obligation to sell under

the FSS contract "only U.S.-made or designated country end products," *id.* ¶ 72 (citing FAR

52.225–5(b)), and a continuing obligation to certify that each end product sold through a FSS contract is TAA compliant, *id.* ¶ 67 (citing FAR 52.225-6(a) ("The offeror certifies that each end product, except those listed in paragraph (b) of this provision, is a U.S.-made or designated country end product, as defined in the clause of this solicitation entitled 'Trade Agreements.'")). Should the defendants seek to sell an end product that is not from a designated country, the defendants must identify the item to the GSA before offering the item for sale. *Id.* ¶ 69 (citing FAR 52.225-6(b) ("The offeror shall list as other end products those supplies that are not U.S.-made or designated country end products.")).

The defendants may also sell to the U.S. Government, without violating the TAA, "open market" items that are not included on the pricelists accompanying the FSS contracts, even when those items originate in non-designated countries. *Id.* ¶¶ 87–88 & n.10; *see also* Westcon Contract at 12 (allowing for sale of open market items, "also known as incidental items, noncontract items, non-Schedule items, and items not on [an FSS] contract"); Comstor Contract at 8–9 (same). The FAR permits vendors to procure these non-contract, "open-market" items in the interest of "administrative convenience," as long as specified requirements under FAR 8.402(f) are met, including requirements for publicizing proposed contract actions and engaging in competitive procedures. TAC ¶ 89–94.

### 2. *The Relator's Business with the Defendants*

At all times relevant to the instant litigation, the relator worked as a Strategic Account Executive at Insight, a "Value Added Reseller" ("VAR") that has partnered with the defendants to sell IT products to federal agencies. *Id.* ¶ 5, 101–02. As a VAR, Insight "combine[s], configure[s], and sell[s] computer products manufactured by other companies in specifically-designed configurations to meet the needs of their customers." *Id.* ¶ 103. In essence, VARs are

"middle-men in the supply chain between the technology manufacturers and their ultimate customers." *Id.* ¶ 104. The defendants partner with VARs and other smaller vendors to facilitate sales either through prime contractor/subcontractor agreements, in which the sub-contractor or "authorized dealer" is not required to maintain its own GSA schedule contract, or through Contractor Team Arrangements ("CTA"), in which both parties maintain GSA schedule contracts, although not necessarily for the same products. *Id.* ¶ 46–54. Here, the relator, "on numerous occasions," sold Cisco products through the defendants' FSS contracts, "both as an authorized dealer . . . and through CTAs with Defendants." *Id.* ¶ 107.

Through his work selling the defendants' products, the relator "routinely accessed" country-of-origin ("COO") charts, which "Cisco regularly created," and "list[ed] product numbers and country-of-origin information for thousands of Cisco products." *Id.* ¶ 108. Cisco provides these charts to vendors, including the relator's employer, Insight, so that the vendors may "check the Country of Origin to comply with government regulations in selling products to the government." *Id.* ¶ 109. In reviewing such COO charts alongside the defendants' pricelists and the purchase orders processed by Insight under the defendants' FSS contracts, the relator began to suspect that the defendants were failing to comply with the TAA in two ways. *Id.* ¶ 111–13; *see also id.*, Ex. 15, Decl. Brady Folliard, Strategic Account Exec., Insight Public Sector ("Folliard Decl."), ECF No. 65-16 (explaining review process). First, he found the defendants "were including non-TAA-compliant products on their FSS contract pricelists," and that they "in fact sold" such products "to the United States Government by concealing the products' true COO information." *Id.* ¶¶ 111–12. Second, the relator came to believe that the defendants "routinely circumvented their TAA-compliance obligations by marking certain end products from non-

designated countries as 'open market,' but then selling those products outside the open market protocol outlined in FAR 8.402." *Id.* ¶ 113.

To illustrate the relator's discovery of the defendants' "misconduct," the Third Amended Complaint cites two example purchase orders that Insight placed under the defendant Weston's GSA FSS contract in 2010 and 2011. *Id.* ¶¶ 116–17, 126 (citing *id.*, Ex. 14, Purchase Order (dated Sept. 24, 2010), ECF No. 65-15; *id.*, Ex. 16, Purchase Order (dated July 28, 2011), ECF No. 65-17); Folliard Decl. Eight of the nine items identified in the Third Amended Complaint as sold through these two purchase orders were listed as "open market" items, and one item is described as an "end product." *See id.* ¶¶ 117–35. The relator alleges that he determined, upon review of Cisco COO charts, that the items had always originated in non-specified non-designated countries. *Id.* ¶¶ 122, 127–35. Based on the relator's understanding of the FAR's treatment of "open market" items of certain monetary values, the Third Amended Complaint claims that these eight items, along with the one identified end product, should have been TAA-compliant and that the defendants engaged in fraudulent activities by selling these items from non-compliant countries. *Id.* ¶¶ 95, 135 (citing FAR 8.405-1(b) ("micro-purchase threshold")).

## B.  Procedural History

Before filing his original Complaint, on April 15, 2011, the relator disclosed to the United States the substance of his allegations that the defendants "are selling products to the United States Government that did not originate in designated countries under the [TAA], and therefore are making material false statements and presenting false claims to the United States Government for payment." Compl. ¶ 9; TAC ¶ 136. While the complaint remained under seal, the United States investigated the relator's allegations, including by issuing a civil investigative demand ("CID") to the defendants to obtain "sales data and supporting documentation for the relevant time period." TAC ¶ 136. The government also requested COO charts from Cisco "for

all products Cisco offered for sale since January 2000." *Id.* ¶ 137. In response, the defendants

provided data, from 2008 through 2011, for $123,531,232.29 in sales under the two GSA

contracts, as well as 49 quarterly COO charts, covering most of the period between January 2000

and September 2012. *Id.* ¶ 136–37 & n.14. The government shared these materials with the

relator, prompting the relator to amend his complaint for the first time on May 30, 2014. *Id.* ¶

140; *see generally* First Am. Compl., ECF No. 27.

On January 29, 2016, almost five years after the relator initiated his *qui tam* suit, the

United States filed notice of its decision to decline intervention. U.S.'s Not. at 1. Thereafter, on

March 4, 2016, both the relator's original Complaint and First Amended Complaint were

unsealed. Order at 1, ECF No. 46. After the relator filed a Second Amended Complaint, *see*

Second Am. Compl., ECF No. 48, the defendants moved to dismiss, and their motion was

considered at a hearing on January 24, 2017, *see* Min. Order (dated Jan. 25, 2017). At the close

of the hearing, the relator was allowed to amend his complaint a third time, resulting in the

denial, as moot, of the defendants' then-pending first motion to dismiss. *Id.*

The Third Amended Complaint, filed on February 23, 2017, asserts four claims against

each defendant for violations of two versions of two provisions of the FCA, both before and after

those two provisions were amended by the Fraud Enforcement Recovery Act ("FERA"), Pub. L.

No. 111-21, 123 Stat. 1617 (2009). The first two counts allege in almost identical language that

the defendants violated the FCA's "presentment provision" by "knowingly submitt[ing], and

caus[ing] to be submitted" to the government "false or fraudulent claims for payment and

reimbursement" that the government paid, "unaware of the falsity of the . . . claims made by the

Defendants," regarding country-of-origin information. TAC ¶¶ 182–189. Count I alleges the

FCA's presentment provision, in 31 U.S.C. § 3729(a)(1) (2008), was violated by defendants'

8

claims submitted "before May 20, 2009," and Count II alleges the same for claims submitted "after May 20, 2009," in violation of 31 U.S.C. § 3729(a)(1)(A) (2009). *See id.* Similarly, the remaining two counts assert virtually identical claims under pre- and post-FERA amendment versions of the FCA's "false statement clause." *Id.* ¶¶ 190–99. Count III alleges that the defendants "knowingly made, used or caused to be made or used, material false statements to obtain" payments from the government for false claims made "before June 7, 2008," in violation of 31 U.S.C. § 3729(a)(2) (2008), and Count IV alleges the same for false claims made "after June 7, 2008," in violation of 31 U.S.C. § 3729(a)(1)(B) (2009). *Id.* ¶¶ 190–99. All four counts are based on allegations that the defendants sold non-TAA compliant end products, resulting in over $8 million in sales "attributable to fraud." *Id.* ¶¶ 143, 184, 188, 193, 198. The relator alleges that the non-compliant products at issue fall into two categories: (1) products on the defendants' FSS pricelists for which the country-of-origin information was falsified, *see id.* ¶¶ 56–86; and (2) products incorrectly marked "open market," which were not and should have been compliant with the TAA, *see id.* ¶¶ 87–100.

The defendants have again moved to dismiss these claims.[3]

## II.    LEGAL STANDARD

### A.    Federal Rule of Civil Procedure 12(b)(1)

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Indeed, federal courts are "forbidden. . . from acting beyond our authority," *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008), and, therefore, have "an affirmative obligation 'to consider whether the

---

[3] After the defendants filed their second motion to dismiss, the case was reassigned to the undersigned on October 24, 2017.

constitutional and statutory authority exist . . . to hear each dispute,'" *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996) (citation omitted).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, the plaintiff bears the burden of establishing the court's jurisdiction by a preponderance of the evidence. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). When considering a motion under Rule 12(b)(1), the court must accept as true all uncontroverted material factual allegations contained in the complaint and "construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged, . . . and upon such facts determine jurisdictional questions." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (internal quotation marks and citations omitted). Although the court is required "to take as true all well-pled factual allegations within [the] complaint," the court must "disregard any legal conclusions, legal contentions couched as factual allegations, and unsupported factual allegations within the complaint." *Gulf Coast Mar. Supply, Inc. v. United States*, 867 F.3d 123, 128 (D.C. Cir. 2017). In evaluating subject matter jurisdiction, the court may look beyond the complaint to "undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)).

### B.    Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wood v. Moss*, 134 S. Ct. 2056, 2067 (2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is facially plausible when the plaintiff pleads factual content that is more than "'merely consistent with' a defendant's liability," and "allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007)); *see also Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012). Although "detailed factual allegations" are not required to withstand a Rule 12(b)(6) motion, a complaint must offer "more than labels and conclusions" or "formulaic recitation of the elements of a cause of action" to provide "grounds" for "entitle[ment] to relief," *Twombly*, 550 U.S. at 555 (alteration in original), and "nudge[ ] [the] claims across the line from conceivable to plausible," *id.* at 570; *see Banneker Ventures*, 798 F.3d at 1129 ("Plausibility requires more than a sheer possibility that a defendant has acted unlawfully . . . .") (internal quotation marks and citation omitted). Thus, "a complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (second alteration in original).

As when considering a motion to dismiss for lack of subject matter jurisdiction, the court must accept all factual allegations in the complaint as true for the purposes of the motion, "even if doubtful in fact," *Twombly*, 550 U.S. at 555; *see also Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015), "but is not required to accept the plaintiff's legal conclusions as correct," *Sissel v. U.S. Dep't of Health & Human Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014). In addition, courts "ordinarily examine" other sources "when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## C.     Federal Rule of Civil Procedure 9(b)

To withstand a motion to dismiss for failure to state a fraud claim, including a claim under the FCA, the plaintiff must meet the pleading standard set out in Federal Rule of Civil Procedure 9(b), which provides that "a party must state with particularity the circumstances

constituting fraud or mistake." FED. R. CIV. P. 9(b); *see also Universal Health Servs., Inc. v. United States ex rel. Escobar* ("*Escobar*"), 136 S. Ct. 1989, 2004 n.6 (2016) ("False Claims Act plaintiffs must also plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b)."); *United States ex rel. Totten v. Bombardier Corp.* ("*Totten I*"), 286 F.3d 542, 551–52 (D.C. Cir. 2002) ("[B]ecause the False Claims Act is self-evidently an anti-fraud statute, complaints brought under it must comply with Rule 9(b)."). This heightened pleading standard is designed to "discourage[] the initiation of suits brought solely for their nuisance value, and safeguard[] potential defendants from frivolous accusations of moral turpitude," as well as "guarantee all defendants sufficient information to allow for preparation of a response." *United States ex rel. Heath v. AT & T, Inc.* ("*Heath*"), 791 F.3d 112, 123 (D.C. Cir. 2015) (first alteration in original) (quoting *United States ex rel. Williams v. Martin–Baker Aircraft Co., Ltd.* ("*Williams*"), 389 F.3d 1251, 1256 (D.C. Cir. 2004)).

The plaintiff must plead with sufficient particularity "the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." *Williams*, 389 F.3d at 1256 (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994)); *see also United States ex rel. Shea v. Cellco P'ship* ("*Shea*"), 863 F.3d 923, 936 (D.C. Cir. 2017). In other words, the plaintiff must provide the "who," "what," "when," and "where" with respect to the circumstances of the fraud, so that the defendant is put on "fair notice of the fraud of which it is accused." *See Heath*, 791 F.3d at 124.

## III. DISCUSSION

The defendants present three grounds for dismissing the relator's Third Amended Complaint. First, they argue that the Third Amended Complaint is barred, under 31 U.S.C. § 3730(e)(4), because the alleged fraud has been publicly disclosed previously, and the relator is

not an original source. Defs.' Mem. Supp. Mot. Dismiss ("Defs.' Mem.") at 8–17, ECF No. 67-

1. Second, according to the defendants, the Third Amended Complaint fails to state a claim

upon which relief can be granted, under either the FCA's presentment provision or the false

statement provision, because the Third Amended Complaint lacks plausible allegations of falsity,

materiality, and scienter. *Id.* at 18–33, 37 n.11. Finally, the defendants contend the Third

Amended Complaint fails to plead facts of the alleged fraudulent scheme with the particularly

required to put the defendants on notice under Rule 9(b). *Id.* at 33–40. These challenges are

addressed *seriatim*.[4]

### A.  The Public Disclosure Bar is Not Triggered

The defendants contend that the Third Amended Complaint must be dismissed under the

FCA' public disclosure bar because the allegations of fraud were disclosed in the relator's

---

[4]   The parties dispute whether the Expert Report of Neal I. Fox ("Fox Report"), which is authored by "a former [GSA] Assistant Commissioner for Acquisition," TAC, Ex. 3, Export Report Neal I. Fox, Principal, Neal Fox Consulting at 1, ECF No. 65-4, and is attached to the Third Amended Complaint, should be considered in evaluating the sufficiency of the relator's factual allegations. *See* Defs.' Mem. at 7–8; Rel.'s Opp'n at 4–6. This report "provide[s] explanatory information about the [TAA] as related to the GSA Schedules Program," Fox Report at 1, in the form of the proposed expert's interpretation of obligations under FAR regulations, without mentioning any *factual* matter pertinent to this case, *see id.* Consequently, the defendants urge that the "purported expert report [] be disregarded because it contains little more than legal conclusions." Defs.' Mem. at 7. Indeed, interpreting the relevant law and regulations is the job of the Court. *See Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge[.]"). The relator defends use of this report summarizing a former agency employee's interpretation of agency regulations as a "routine" practice, Rel.'s Opp'n at 4, but the three non-binding, out-of-circuit cases cited for this proposition simply do not show that such a report addressing purely legal matters has been used in evaluating the sufficiency of a complaint's *factual* allegations to withstand a motion to dismiss, *see id.* (citing *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 821 (C.D. Ca. 2011) (denying motion to strike expert report, but finding report "not essential to . . . finding that Plaintiffs' complaint survives Defendants' motion to dismiss"); *Semsroth v. City of Wichita, Kansas*, Civ. No. 06-2376 (KHV), 2007 U.S. Dist. LEXIS 25705, at *1 (D. Kan. Apr. 5, 2007) (denying Rule 12(f) motion to strike thirteen paragraphs in the complaint and attached expert report, where, without distinguishing the report, the court concluded "[s]ustaining the motion to strike would reduce the complaint to an absurdity"); *Bernstein v. City of New York*, 621 F. App'x 56, 58 (2d Cir. 2015) (explaining that "amended complaint and attached expert report describ[ing] particular instances of the Park's alleged inaccessibility," were considered in evaluating plaintiff's standing under the Americans with Disabilities Act, 42 U.S.C. 12101 *et seq.*, because the expert report focused specifically on plaintiff's disability *vis-à-vis* the challenged park configuration)). The relator's proposed expert report will not be considered in resolving the pending motion.

complaints in prior *qui tam* lawsuits and in the government's response to the relator's FOIA request. Defs.' Mem. at 9. Further, the defendants argue that the relator cannot overcome the bar because he has not demonstrated that he is "an original source." *Id.* at 13. As explained below, after describing the framework for analyzing the public disclosure bar, the relator's claims are not barred on this basis.

### 1.     *The Public Disclosure Bar Framework*

"The FCA encourages insiders to expose fraudulent conduct, but does not reward relators who seek to profit by bringing suits to complain of fraud that has already been publicly disclosed." *United States ex rel. Oliver v. Philip Morris USA Inc.* ("*Oliver I*"), 763 F.3d 36, 39 (D.C. Cir. 2014); *see also United States ex rel. Springfield Terminal Ry. Co. v. Quinn* ("*Springfield Terminal*"), 14 F.3d 645, 651 (D.C. Cir. 1994) ("The history of the FCA *qui tam* provisions demonstrates repeated congressional efforts to walk a fine line between encouraging whistle-blowing and discouraging opportunistic behavior."). To that end, the FCA contains a public disclosure bar, codified at 31 U.S.C. § 3730(e)(4)(A), that "limits the ability of a private party to bring a *qui tam* suit where the fraud is already publicly known," unless the claims are brought by the Attorney General or an "original source" of the information underlying the claims. *Oliver I*, 763 F.3d at 39; *Shea*, 863 F.3d at 927 ("The bar prohibits private parties from bringing suit based on a fraud already disclosed through identified public channels (unless the relator is 'an original source of the information')." Thus, "[t]he FCA sets up a two-part test for determining jurisdiction." *United States ex rel. Findley v. FPC-Boron Emps.' Club*, 105 F.3d 675, 681 (D.C. Cir. 1997). First, the court must determine whether the information underlying the allegations and transactions has been publicly disclosed through enumerated channels. *See Springfield Terminal*, 14 F.3d at 651. "If—and only if—the answer to the first question is

affirmative, will the court then proceed to the original source inquiry." *Id.* (internal quotation marks and citation omitted); *see also Oliver I*, 763 F.3d at 39 n.3 ("Because we conclude that the information supporting Oliver's claim had not been publicly disclosed, we do not reach the question whether Oliver was an 'original source.'").

Section 3730(e)(4)(A) was amended, effective March 23, 2010, as part of the Patient Protection and Affordable Care Act, *see* Patient Protection and Affordable Care Act, Pub. L. No. 111–148, § 10104(j)(2), 124 Stat. 119, 901–02 (2010). The pre-amendment version of § 3730(e)(4)(A), enacted in 1986, provided:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (1986). As amended, section 3730(e)(4)(A) currently provides:

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
>
> > (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> >
> > (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
> >
> > (iii) from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (2010).

As a threshold matter, the parties agree that the 2010 amendment is not retroactive, and thus the alleged conduct occurring prior to March 23, 2010, which covers the bulk of the relevant sales, would be subject to the pre-amendment version of the public disclosure bar, while later

alleged conduct would be subject to the post-amendment version. *See* Defs.' Mem. at 8 n.2;

Rel.'s Opp'n Defs.' Mot. Dismiss ("Rel.'s Opp'n") at 9, ECF No. 69; *see also* TAC ¶ 12 ("[T]he

vast majority of those sales occurred in the early years . . . 2006 and 2007.").[5] Among the

changes to the public disclosure bar resulting from the amendment is that while the pre-2010

public disclosure bar was expressly jurisdictional, the 2010 amendment omits the jurisdictional

language and states only that a court must "dismiss" a case falling under the public disclosure

bar. "Thus, when the amended version of § 3730(e)(4)(A) applies, public disclosure does not

deprive the Court of subject matter jurisdiction, but merely deprives the plaintiff of his claim."

*United States ex rel. Shea v. Verizon Commc'ns, Inc.*, 160 F. Supp. 3d 16, 24 (D.D.C.

2015), *aff'd sub nom. United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923 (D.C. Cir.

2017).[6]

Nonetheless, under both the pre- and post-amendment versions of § 3730(e)(4)(A), a

court must decide if either "the *allegation* of fraud itself" *or* "the *transactions* that give rise to an

inference of fraud" have been publicly disclosed. *United States ex rel. Oliver v. Philip Morris

USA Inc.* ("*Oliver II*"), 826 F.3d 466, 471 (D.C. Cir. 2016) (emphases added); *Shea*, 863 F.3d at

933; *see also* 31 U.S.C. § 3730(e)(4)(A) (1986) ("No court shall have jurisdiction over an action

---

[5]       The D.C. Circuit has not opined whether the 2010 amendment to § 3730(e)(4)(A) applies retroactively to conduct that occurred prior to March 23, 2010. The most recent D.C. Circuit case on the public disclosure bar, which was issued during the pendency of the defendants' Motion to Dismiss, *see* Rel.'s Not. Suppl. Authority ("Rel.'s Not."), ECF No. 72; Defs.' Resp. Not. Suppl. Authority ("Defs.' Resp. Not."), ECF No. 73, confirms that the question of retroactivity is not settled, *see Shea*, 863 F.3d at 932–33 (noting "the parties dispute [over] which version of the public disclosure bar governs" because the relator filed his action in 2009, while his amended complaint was filed in 2010, but concluding that "[w]e need not resolve the dispute because, even applying the pre-amendment version to all allegations, we hold in [the relator's] favor"). Here, application of either version of the public disclosure bar favors the relator, and thus the issue of retroactivity need not be addressed.

[6]       The defendants posit that the law in this circuit is unclear "whether the public disclosure bar remains jurisdictional following the 2010 amendment," Defs.' Mem. at 5 n.1, but the D.C. Circuit explicitly referred to the earlier "jurisdictional" and later "non-jurisdictional" versions of the public disclosure bar, and thereby plainly distinguished the two versions of the provision. *See* 863 F.3d 923, Consistent with this binding authority, the post-amendment public disclosure bar is considered here to be "non-jurisdictional." *Id.*

under this section based upon the public disclosure of *allegations or transactions . . . .*"
(emphasis added)). "'Transaction' in this sense 'refers to two or more elements that, when
considered together, give rise to an inference that fraud has taken place.'" *Oliver II*, 826 F.3d at
471 (quoting *Oliver I*, 763 F.3d at 40).

The D.C. Circuit has set out a now familiar formula to assess whether a transaction was
publicly disclosed: "[I]f X + Y = Z, Z represents the *allegation* of fraud and X and Y represent
its essential elements. In order to disclose the *transaction* publicly, the combination of X and Y
must be revealed, from which readers or listeners may infer Z, *i.e.*, the conclusion that fraud has
been committed." *Springfield Terminal*, 14 F.3d at 654 (emphases in original); *Shea*, 863 F.3d at
933 ("If the allegation of fraud (Z) is not itself in the public domain, then the bar applies only if
both X and Y are publicly known.").

Applied to the facts of this case, the transaction would be the fact that the defendants
were selling TAA non-compliant products to the government (X), plus the fact that the
defendants falsely certified that they were complying with the TAA (Y), which permits the
inference that the defendants committed fraud (Z). *See Oliver II*, 826 F.3d at 471; *see also
Springfield Terminal*, 14 F.3d at 655 ("Fraud requires recognition of two elements: a
misrepresented state of facts *and* a true state of facts." (emphasis in original)). If either X and Y,
or Z, was in the public domain before the relator brought this action, then the plaintiff's claims,
under the applicable version of the public disclosure bar, cannot proceed. *See Oliver II*, 826 F.3d
at 471.

### 2. *The Purported Public Disclosures do not Trigger the Bar*

The defendants contend, without distinguishing the analysis for pre- and post-amendment
sales under § 3730(e)(4)(A), that the Z element in this case, *i.e.*, the fraud alleged, was "'based

upon' and substantially similar' to the allegations of fraud raised in earlier *qui tam* actions."

Defs.' Mem. at 10. Since "there is a comparable 'allegation' of fraud in the prior public

disclosures," the defendants reason that "the D.C. Circuit's X + Y = Z formulation . . . is not

applicable." Defs.' Reply Supp. Mot. Dismiss ("Defs.' Reply") at 4, ECF No. 71.[7] The relator

responds that his earlier *qui tam* actions "do not implicate these Defendants in any way," and the

Third Amended Complaint "is based exclusively on information that is independent of any FOIA

request or response." Rel.'s Opp'n at 10–17.[8] The Court agrees with the relator: none of his

prior complaints provide the basis for the allegations in the instant matter.[9]

---

[7]      The defendants focus almost exclusively on the "Z" element, *see, e.g.,* Defs.' Resp. Not. at 2 ("Defendants have demonstrated in this case that an 'allegation' of fraud involving Defendants appears in the public domain – and thus there is no need to resort to an analysis of whether a misrepresented state of facts (X) and a true state of facts (Y) also appear in the public domain."), and offer only a brief footnote asserting "even if the allegations of fraud in Relator's prior complaints could somehow be construed not to constitute publicly-disclosed 'allegations' of fraud, then Relator's prior *qui tam* complaints nonetheless still triggered the public disclosure bar by disclosing both the true state of facts (X: that Cisco products supplied by Defendants for sale to the government allegedly were not TAA-compliant) and the allegedly misrepresented state of facts (Y: certifications that the Cisco products were TAA-compliant)," *id.* at 2 n.1. The defendants provide no further analysis addressing how these "essential elements" of the D.C. Circuit's formulation are actually triggered, *see Springfield Terminal*, 14 F.3d at 654, let alone, how such an analysis would overcome the obvious hurdle that the prior complaints did not contain allegations describing the defendants' specific sales activities as fraudulent. Thus, this opinion examines only whether the fraud "allegations" in the instant matter, as opposed to any "essential elements," have already been disclosed in the prior *qui tam* suits.

[8]      Based on the conclusion that the amended public disclosure bar is not jurisdictional, the relator also argues that "Defendants have waived their right to move for dismissal under the amended provision, since Defendants could have raised this same defense in response to Relator's earlier *qui tam* complaints in this case." Rel.'s Opp'n at 15 n.5. The relator's waiver argument is not persuasive. As support, the relator cites two cases, which held only that the defense of *improper venue* under Rule 12(b)(3) is waived when not raised in an initial motion to dismiss or other response to a pleading that is subsequently amended. *See id.* (citing *Nichols v. Vilsack*, 183 F. Supp. 3d 39, 41 (D.D.C. 2016); *Weber v. Turner*, 1980 U.S. Dist. LEXIS 17002, *7 (D.D.C. Oct. 2, 1980)). No such waiver rule applies to assertion by defendants of the public disclosure bar. In addition, the relator relies on *Hild v. Bank of Am., N.A.*, 2015 U.S. Dist. LEXIS 55029 (C.D. Cal. April 21, 2015), for the proposition that "some courts have held that successive motions to dismiss for failure to state a claim are not allowed," *id.* at *8–9, but, as that decision acknowledges, "[s]ome courts have held to the contrary," *id.* at *9 n.2. The latter rule is followed by this Court, based upon the plain text of Federal Rule of Civil Procedure 12(h). *See, e.g., Nattah v. Bush*, 770 F. Supp. 2d 193, 201 (D.D.C. 2011) (noting that Rule 12(g), which generally bars a moving party from making another motion raising a defense or objections omitted from an earlier motion, "is explicitly limited by Rule 12(h), which exempts from the waiver rule . . . motions to dismiss for failure to state a claim brought pursuant to Rule 12(b)(6)"); *Lindsey v. United States*, 448 F. Supp. 2d 37, 55 (D.D.C. 2006), *abrogated on other grounds by Ramer v. United States* 620 F. Supp. 2d 90 (D.D.C. 2009) ("[A] defense of failure to state a sustainable claim is not waived simply by the defendant's failure to include it in an initial 12(b) motion submitted to the Court.").

[9]      The defendants also contend that the instant action is "based in large part on another indisputable public disclosure—the government's response to Relator's Freedom of Information Act ("FOIA") request." Defs.' Mem. at 12–13 (citing allegation in original complaint that relator "relied on" response by the government to a FOIA

At the outset, the defendants summarize their understanding of the "core allegation of fraud in the instant suit: "that Comstor — allegedly the sole authorized FSS contract holder for Cisco products prior to March 17, 2010 — sold Cisco products to the government that were manufactured in non-designated countries and therefore violated the [TAA]." Defs.' Mem. at 10. The relator does not dispute this summary of his fraud allegations but contests that he "previously asserted these same allegations relating to the sale of purportedly non-compliant Cisco products to the government in [the] earlier *qui tam* actions in this district against multiple re-sellers." *Id.*; *accord* Rel.'s Opp'n at 11.[10] The defendants point to three prior actions filed by the relator and, yet, provide analysis of the public disclosure bar as it pertains to only two of those complaints. *See* Defs.' Mem. at 10–12 (discussing Defs.' Mot., Ex. B, Compl. ("*World Wide Technologies* Compl."), ¶¶ 18–19, 21, ECF No. 67-4; *id.*, Ex. C, Compl. ("*Apptis* Compl."), ¶¶ 18–19, 21, ECF No. 67-5). Examination of these two *qui tam* complaints, which

---

request the relator submitted to the GSA in 2013). The relator's FOIA request sought sales and transactional data for Cisco products sold by vendors through GSA between 2003 and 2011. *Id.* at 13. While a FOIA response may constitute a public disclosure, *see Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 404 (2011) (holding written FOIA responses by the government were considered a "report" within the definition of the public disclosure bar), such a response does not trigger the public disclosure bar if it only provides background information, without a connection to the alleged fraudulent scheme, which is the case here, *see United States ex rel. Purcell v. MWI Corp.*, 824 F. Supp. 2d 12, 24 (D.D.C. 2011), *rev'd on other grounds and remanded*, 807 F.3d 281 (D.C. Cir. 2015) (finding public disclosure bar not triggered where relator "insists that no documents relating to the allegations and transactions in the Complaint were released by the" government in response to a FOIA request, and "the defendant fails to provide a wisp of testimony or documentary evidence that might controvert [the relator's] assertion"). GSA's response to the FOIA request provided only sales data without any COO data, and the latter data is the critical link to the alleged fraud. The law is well-established that the public disclosure bar is not triggered where, as here, a relator has "supplied the missing link between the public information and the alleged fraud." *See Shea*, 863 F.3d at 935 (citing *Springfield*, 14 F.3d at 657). Thus, the relator's FOIA response is irrelevant to application of the public disclosure bar here.

[10] The defendants argue that only the original complaint may be considered for the purposes of determining whether the public disclosure bar has been triggered. *See* Defs.' Reply at 3. This argument is a red herring. For the purposes of evaluating the sufficiency of the relator's allegations, the Third Amended Complaint is operative. *See United States Telesis, Inc. v. Ende*, 297 F.R.D. 159, 162 (D.D.C. 2013) ("The plaintiff's amended complaint is now the operative complaint due to its superseding nature.") (citing *Washer v. Bullitt Cty*, 110 U.S. 558, 562 (1884); *Bancoult v. McNamara*, 214 F.R.D. 5, 13 (D.D.C.2003)); *Adams v. Quattlebaum*, 219 F.R.D. 195, 197 (D.D.C. 2004) (same). To determine whether the allegations have already been disclosed in the public domain, the operative complaint must be reviewed, as well as the entire record in this case and the complaints in other cases proffered by the defendants.

were both voluntarily dismissed by the relator shortly after the government declined intervention, *see* Gov't's Not. Election Decline Intervention, *Folliard v. Apptis, In*c. ("*Apptis*")*,* Civ. No. 08-320 (EGS) (D.D.C. Feb. 12, 2010), ECF No. 11; Not. of Voluntary Dismissal, *Apptis*, (D.D.C. Feb. 23, 2010), ECF No. 13; Gov't's Not. Election Decline Intervention, *Folliard v. World Wide Technologies, Inc*. ("*World Wide Technologies*"), Civ. No. 08-761 (ESH) (D.D.C. June 1, 2008), ECF No. 10; Not. of Voluntary Dismissal, *World Wide Technologies*, (D.D.C. June 4, 2010), ECF No. 14, demonstrate the weakness of the defendants' position.[11]

The complaints in *Apptis* and *World Wide Technologies* use almost identical language to allege that the defendants submitted false claims and made false statements to the U.S. government "in connection with improper pricing and the selling of non-compliant products," in violation of the TAA. *See Apptis* Compl. ¶¶ 4, 22–32; *World Wide Technologies* Compl. ¶¶ 4, 22–32. Each defendant allegedly sold Cisco products as "a certified partner of Cisco Systems" to the government through Solutions for Enterprise-Wide Procurement ("SEWP") contracts that required compliance with the TAA. *Apptis* Compl. ¶¶ 7, 14; *World Wide Technologies* Compl. ¶¶ 7, 14. The relator, in preparing government proposals for his employer, Insight, another Cisco partner, "became familiar with Cisco products being offered for sale by" each defendant, including the "Cisco products that were produced in non-designated countries." *World Wide*

---

[11] The third complaint referenced by defendants without analysis, *see* Defs.' Mem. at 10–12 (citing Defs.' Mot., Ex. A, Corrected Second Am. Compl. ("*Insight* Compl."), ECF No. 67-3), is not helpful in supporting application of the public disclosure bar. In that case, again, the government declined to intervene, *see* Gov't Not. Decline Intervention, *Folliard v. Insight Enterprise Inc.* ("*Insight*"), Civ. No. 07-719 (RCL) (D.D.C. May 27, 2010), ECF No. 31, and, ultimately, all eight defendants prevailed, *see United States ex rel. Folliard v. Synnex Corp.* ("*Synnex*"), 798 F. Supp. 2d 66, 77, 81 (D.D.C. 2011) (granting motion to dismiss as to six defendants under first-to-file bar and, as to one of those six, also on *res judicata* grounds); *United States ex rel. Folliard v. Gov't Acquisitions, Inc.* ("*Gov't Acquisitions*"), 880 F. Supp. 2d 36, 48–49 (D.D.C. 2012), *aff'd*, 764 F.3d 19 (D.C. Cir. 2014) (granting summary judgment in favor of one defendant and partial summary judgment to the other defendant); *United States ex rel. Folliard v. Govplace* ("*Govplace*"), 930 F. Supp. 2d 123, 137 (D.D.C. 2013), *aff'd sub nom. United States ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19 (D.C. Cir. 2014) (granting remaining defendant's motion for summary judgment and dismissing case with prejudice). The instant defendants are not mentioned anywhere in the 61-page *Insight* complaint, nor does the complaint invite an inference that other entities were involved. Thus, that complaint does not bar the instant *qui tam* action.

*Technologies* Compl. ¶¶ 15, 18; *Apptis* Compl. ¶¶ 15, 18. "He learned of these products by communicating with his supervisors who had been in contact with Cisco representative about proposals and by communicating directly with a Cisco Representative about certain products." *World Wide Technologies* Compl. ¶ 18; *Apptis* Compl. ¶ 18. More "specifically," he exchanged emails with Steve Marcellino, the Government Programs Coordinator for Comstor, which company is described as "a designated point of sale for Cisco Systems." *World Wide Technologies* Compl. ¶ 19; *Apptis* Compl. ¶ 19. The relator reviewed the information obtained from the email exchange alongside product lists he had obtained through his own work with each company to determine that the defendants were "selling several non-compliant Cisco products through SEWP in violation of the TAA." *World Wide Technologies* Compl. ¶ 21; *Apptis* Compl. ¶ 21.

Turning now to the public-disclosure-bar analysis, the complaints in *Apptis* and *World Wide Technology* do not actually make any allegations or provide any information about the sales by the instant defendants. Nonetheless, the defendants contend that the Third Amended Complaint is barred because the relator's complaints in *Apptis* and *World Wide Technologies* "specifically identified Comstor as the designated point of sale for the purportedly non-compliant Cisco products," and "identified Comstor employee Steve Marcellino as the 'Cisco Representative' providing him information regarding the alleged sale of Cisco products in violation of the TAA." Defs.' Mem. at 11 (emphasis in original). Thus, in the defendants' view, the allegations in the present *qui tam* lawsuit have previously been disclosed. *Id.* at 12. The relator counters that the public disclosure bar has not been triggered because "while [the] prior *qui tam* complaints reference the fact that the various named defendants all sold Cisco products as authorized re-sellers for Westcon and Comstor, Relator did not allege that Defendants

themselves took part in a conspiracy to defraud the Government, or engaged in any other misconduct." Rel.'s Opp'n at 10. The relator is correct.

In considering whether the allegations in the instant action are "substantially similar to" or "based upon" the allegations in the three prior *qui tam* cases, the key question is "whether the publicly disclosed information could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing." *United States ex rel. Settlemire v. District of Columbia* ("*Settlemire*"), 198 F.3d 913, 918 (D.C. Cir. 1999) (internal quotation marks omitted); *see also United States ex rel. Davis v. District of Columbia* ("*Davis I*"), 679 F.3d 832, 836 (D.C. Cir. 2012). Here, the defendants contend that law enforcement would have been alerted to the wrongdoings alleged in the instant action because the relator's "prior *qui tam* actions identified *Comstor* by name; alleged that *Comstor's* authorized re-sellers were selling non-TAA compliant Cisco products to the government; and that the same Comstor employee confirmed that the products being sold to the government were non-compliant." Defs.' Reply at 6 (emphasis in original).

The aspects of the complaints in the relator's other *qui tam* cases highlighted by the defendants obscure the fundamental fact that those prior complaints assert no allegations against the defendants. First, only two of the *qui tam* complaints even identify the defendants by name, and, in doing so, they only mention Comstor as "a designated point of sale for Cisco products." *Apptis* Compl. ¶ 19; *World Wide Technologies* Compl. ¶ 19. The filings say nothing about the defendants' involvement in the alleged fraudulent scheme. Second, and relatedly, the allegations against the resellers are not directly linked to Comstor, especially since Comstor is alleged to be "*a* designated point of sale," *Apptis* Compl. ¶ 19; *World Wide Technologies* Compl. ¶ 19, and not *the* designated point of sale. Finally, the fact that a Comstor representative confirmed the

products being sold were non-compliant does not create an inference that Comstor participated in any scheme to defraud the government, but rather suggests that the defendants were being *helpful* in working with a vendor to try to comply with TAA requirements. *See* Rel.'s Opp'n at 11 ("The fact that some Cisco products are manufactured in non-designated countries was never a secret . . ., [and] Relator asked the Comstor employee about the TAA-compliance status of certain Cisco products in order 'to avoid violating the TAA.'") (quoting Defs. Mem. at 11).

To be sure, the defendants need not be named in the public disclosures to trigger the bar, *see, e.g., United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 48 (D.D.C. 2007) (finding where prior public disclosures "alleged that certain specific Columbia facilities had engaged in certain specific techniques for defrauding Medicare," and "many other facilities, not named therein, had engaged in similar fraudulent practices," a *qui tam* suit against a "not named" Columbia facility for Medicare fraud was barred), and the bar can be triggered even when "a *qui tam* suit [is] 'even partly based upon publicly disclosed allegations or transactions.'" *United States ex rel. J. Cooper & Assocs., Inc. v. Bernard Hodes Grp.*, Inc., 422 F. Supp. 2d 225, 235 n. 10 (D.D.C. 2006) (quoting *United States ex rel. Precision Co. v. Koch Indus.*, 971 F.2d 548, 552 (10th Cir. 1992)) (rejecting "plaintiff's argument that its *qui tam* claim is not 'based upon' information in [a report] merely because the Report does not mention actual payments or claims for payment."). Nonetheless, the instant case is distinguished from such situations because none of the *qui tam* complaints previously filed by the relator suggested "other" entities complicit in the alleged fraud scheme, or, more importantly, alleged that the instant defendants were involved in the alleged fraud. Rel.'s Opp'n at 10. Indeed, contrary to the defendants' argument that the relator here "simply 'provid[es] "more specific details"' or 'reveal[s] specific instances of fraud where the general practice has already been publicly

disclosed,'" Defs.' Mem. at 10 (quoting *Oliver II*, 826 F.3d at 472 (quoting *Settlemire*, 198 F.3d

at 919 (D.C. Cir. 1999))), the Third Amended Complaint targets the defendants for the first time

as being involved in fraudulent activity violative of the FCA, even though the alleged manner of

execution of the fraud scheme allegedly was also used by the defendants named in the other

cases.[12]

Thus, the relator's earlier filed *qui tam* actions would not have meaningfully alerted any

government investigator of the fraud presently alleged. *See Settlemire*, 198 F.3d at 918; *see also*

*United States v. CSL Behring, L.L.C.*, 855 F.3d 935, 942–44 (8th Cir. 2017) (noting "[i]n order to

bar claims against a particular defendant, the public disclosures relating to the fraud must either

explicitly identify that defendant as a participant in the alleged scheme, *or provide enough*

*information about the participants in the scheme such that the defendant is identifiable*" as a

participant in that scheme) (alteration and emphasis in original) (internal citation omitted);

*United States ex rel. Dig. Healthcare, Inc. v. Affiliated Comput. Servs.*, Inc., 778 F. Supp. 2d 37,

49–51 (D.D.C. 2011) (explaining that "while the government may be aware of fraud and

improper payments being made by participants in the Medicaid program on a general level, it

was not 'squarely on the trail' of the defendant," where the purported public disclosures "reveal

some important background information," but do "not rise to the level of 'allegations or

transactions'") (quoting *United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568, 571 (10th

---

[12]     As the relator notes, "[i]t is unclear whether Defendants attempt to argue that Relator's prior *qui tam*
actions resulted in an 'industry-wide' public disclosure – which can trigger the public disclosure bar even when a
subsequent defendant was not specifically named." Rel.'s Opp'n at 11.  The relator correctly points out, however,
that "[e]ven if Defendants had articulated an 'industry-wide' argument, that argument would fail because Relator's
prior lawsuits did not implicate all members of the industry – or even a significant percentage of them – as
fraudsters." *Id.* at 11–12 (citing *United States ex rel. Baltazar v. Warden et al.*, 635 F.3d 866, 869 (7th Cir. 2011);
*In re Nat. Gas Royalties*, 562 F3d 1032, 1040–1043 (10th Cir. 2009); *Cooper v. Blue Cross & Blue Shield  of Fla.,
Inc.*, 19 F.3d 562, 566 (11th Cir. 1994)).  Since the defendants do not explicitly raise this "industry-wide" theory, it
will not be considered.

Cir.1995)); *cf. Davis I*, 679 F.3d at 836 (applying public disclosure bar where an earlier "report revealed to the public" an allegation pertaining specifically to the defendant "and provided ample reason for the government to investigate further").[13]

    For these reasons, the defendants' arguments regarding the relator's prior *qui tam* actions provide no basis for dismissing the claims as barred by the public disclosure bar.[14]

### B.    The Relator Fails to State a Claim for Relief

    The Third Amended Complaint focuses on two categories of allegedly non-compliant Cisco products that the defendants sold to the federal government: products sold through the defendants' GSA FSS contracts and products "incidental" to the contracts, which the relator argues were improperly identified as "open market" items. TAC ¶¶ 9, 11. The relator bases these allegations on his review of 49 quarterly Cisco COO charts for the period covering January 2000 to September 2012, and data for over $123 million in the defendants' sales, which charts

---

[13]    Two additional arguments raised by the relator may be summarily dispensed as unpersuasive and having no part in the conclusion that his prior *qui tam* actions did not trigger the public disclosure bar. First, the Relator suggests that his own prior lawsuits cannot operate as a bar because the FCA is concerned with preventing "parasitic lawsuits brought by opportunistic litigants seeking to capitalize on public disclosures," Rel.'s Opp'n at 13–14 (internal quotation marks and citation omitted), and the relator "is not a 'parasite' of his own prior court filings," *id.* To the contrary, in evaluating application of the public disclosure bar, courts may and do consider a relator's prior public disclosures, *see* Defs.' Reply at 5 n.1 (citing *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 384 F.3d 168, 174 (5th Cir. 2004)*; United States ex rel. Poteet v. Bahler Med., Inc.* ("*Poteet*")*,* 619 F.3d 104, 114 (1st Cir. 2010)*; In re Nat. Gas Royalties*, 562 F.3d at 1040), and such prior disclosures by a relator may preserve a *qui tam* lawsuit only if the relator is the "original source," *Poteet*, 619 F.3d at 113 ("[T]he 'original source' exception already ensures that the most valuable relators—typically insiders with direct and independent knowledge of fraud—will not be barred by prior public disclosures, whether made by the relators themselves or others."). Second, the relator contends that "the amended public disclosure provision makes clear that only 'a Federal criminal, civil, or administrative hearing <u>in which the Government or its agent is a party</u>' will trigger the bar," and "[s]ince the Government did not intervene in any of Relator's prior qui tam suits, none of these suits triggered the new public disclosure bar." Rel.'s Opp'n 14–15. This argument loses sight of the fact that in every *qui tam* action, the government is the "real party in interest." *United States ex rel. Landis v. Tailwind Sports Corp.*, 98 F. Supp. 3d 8, 11 (D.D.C. 2015) ("[T]he United States is a real party in interest even if it does not control the [FCA] suit.") (quoting *Searcy v. Philips Elecs. N. Am. Corp.*, 117 F.3d 154, 156 (5th Cir. 1997) (citing *United States ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 961 F.2d 46, 48–49 (4th Cir. 1992))).

[14]    Although the defendants discuss at length whether the relator is an "original source," *see* Defs.' Mem. at 13–18; Defs.' Reply at 8, the conclusion that the relator's allegations are not based on publicly disclosed information precludes any need to "proceed to the 'original source' inquiry," *Springfield Terminal*, 14 F.3d at 651; *see also* Rel.'s Opp'n at 16–17 ("[s]ince the public disclosure bar was never triggered, Relator does not need to establish original source status.").

and data were obtained during the government's five-year investigation and provided to the relator. *See id.* ¶¶ 136–40.[15]  Although the Third Amended Complaint purports to cover an almost thirteen-year time period of "2005 and continuing to the present" and alleges that "thousands of [Cisco] end products" were sold, in violation of the TAA, the relator relies on only 46 "representative examples" of transactions from nineteen different purchase orders, covering a five-year period between September 29, 2008, and December 12, 2013.  *See id.* ¶¶ 1, 116, 143, 145.  The defendants assert that the Third Amended Complaint fails to meet the pleading requirements under Rules 12(b)(6) and 9(b).  *See* Defs.' Reply at 23.  The defendants are correct, as explained below.

### 1. *Liability under the FCA*

The relator has plead claims under both the presentment and false statement provisions of the FCA for both pre- and post-FERA amendment conduct.  Specifically, the relator alleges, in Counts I and II, violations of the pre-FERA presentment clause for claims submitted prior to May 20, 2009, and of the post-FERA presentment clause for claims submitted after May 20, 2009, respectively; and, in Counts III and IV, violations of the pre-FERA false statement clause for statements made prior to June 7, 2008, and of the post-FERA false statement clause for statements made after June 7, 2008, respectively.

In its current form, the FCA provides for civil liability for anyone who: (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A); or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," § 3729(a)(1)(B).  The "presentment clause," in 31 U.S.C. § 3729(a)(1)(A), and "false statement clause," § 3729(a)(1)(B), have

---

[15]  According to the relator, "Cisco noted that it was unable to locate the chart for January 2003, and that chart was not included in Cisco's production."  TAC ¶ 137 n.15.

always been "complementary," as they were "designed to prevent those who make false records or statements to get claims paid or approved from escaping liability solely on the ground that they did not *themselves* present a claim for payment or approval." *United States ex rel. Totten v. Bombardier Corp.* ("*Totten II*"), 380 F.3d 488, 501 (D.C. Cir. 2004) (emphasis in original). In amending the presentment clause, formerly codified at 31 U.S.C. § 3729(a)(1), FERA removed language requiring that the claim be presented to an officer or employee of the government or armed forces. FERA § 4(a). The FERA amendment to the false statement clause, formerly codified at 31 U.S.C. § 3729(a)(2), replaced the language of "false record or statement to get a false or fraudulent claim paid or approved by the government" with "statement material to a false or fraudulent claim." FERA § 4(a). The presentment clause was made effective the day of enactment, May 20, 2009, and the false statement amendment clause was made retroactive to June 7, 2008. FERA § 4(f). In alleging claims under these provisions or any other provision of the FCA, the relator must satisfy Rule 9(b)'s heightened pleading standard. *See Heath*, 791 F.3d at 123; *Totten I*, 286 F.3d at 551–52.

Given the similarity of the conduct prohibited by both provisions of the FCA, the parties do not meaningfully distinguish them in their briefing. For organizational clarity, the presentment claims in Counts I and II are addressed first before turning to the false statement claims in Counts III and IV.

### 2. *Relator's Presentment Claims*

To bring a claim under the presentment provision of the FCA, a relator must allege factual allegations plausibly showing that the defendant submitted "[1] a claim to the government, [2] that the claim was false, and [3] that the defendant knew that the claim was false.'" *United States ex rel. Davis v. District of Columbia* ("*Davis II*"), 793 F.3d 120, 124 (D.C.

Cir. 2015) (quoting *United States ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 318 F.3d 214, 218 (D.C. Cir.2003)).  The falsity must also be material to the government's decision to pay in order to be actionable under the FCA.  *See Escobar*, 136 S. Ct. at 1996; *see also United States v. Sci. Applications Int'l Corp.* ("*SAIC*"), 626 F.3d 1257, 1269 (D.C. Cir. 2010).  While conceding the first element as to submission of claims to the government, the defendants vigorously dispute the sufficiency of the allegations as to the other two elements.  *See generally* Defs.' Mem. at 18–33; Rel.'s Opp'n at 18–19.  The Third Amended Complaint sufficiently alleges that the defendants presented false claims with respect to certain end products, but the relator has not adequately pled that the claims presented were material to the federal government's decision to pay, or that the defendants "knowingly" presented the false claims.  Consequently, neither count, as detailed below, survives the defendants' dismissal motion.

"In the paradigmatic case, a claim is false because it 'involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided.'"  *SAIC*, 626 F.3d at 1266 (quoting *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001), *abrogated on other grounds by Escobar*, 136 S. Ct. 1989)).  Alternatively, however, "a plaintiff may proceed under the so-called 'certification' theory of liability," under which "the falsity of a claim for payment rests on a false representation of compliance with an applicable federal statute, federal regulation, or contractual term."  *United States ex rel. McBride v. Halliburton Co.* ("*McBride*"), 848 F.3d 1027, 1031 (D.C. Cir. 2017) (internal quotation marks and citations omitted).  "False certifications can be either express or implied."  *SAIC*, 626 F.3d at 1266.  "An expressly false claim is, as the term suggests, a claim that falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment."  *Mikes*, 274 F.3d at 698.  An "implied false certification" occurs "[w]hen . . . a defendant makes

representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements." *McBride*, 848 F.3d at 1031 (alteration in original) (quoting *Escobar*, 136 S. Ct. at 1999). The Third Amended Complaint alleges that the defendants made "express and implied false certifications of compliance with contractual and regulatory requirements," TAC ¶ 2; *see also id.* ¶ 86, but, for the most part, the parties do not discuss the two forms of false certification separately. Instead, the parties' analysis relies on the standard for alleging implied false certifications, which therefore is this Court's focus.

The D.C. Circuit has explained that implied false certification claims for the underlying claim for payment at issue need not include "express contractual language specifically linking compliance to eligibility for payment." *SAIC*, 626 F.3d at 1269. A showing "that the contractor withheld information about its noncompliance with material contractual requirements" is sufficient to state such a claim. *Id.* Both the Supreme Court and the D.C. Circuit, however, have instructed that "courts should continue to police expansive implied certification theories 'through strict enforcement of the Act's materiality and scienter requirements.'" *McBride*, 848 F.3d at 1031 (quoting *Escobar*, 136 S. Ct. at 2002 (quoting *SAIC*, 626 F.3d at 1270)). The sufficiency of the relator's factual allegations regarding falsity, materiality and scienter are addressed in that order.

a)      *Falsity*

The defendants argue broadly that the relator has failed to "plead facts sufficient to allege falsity" for three reasons: (1) generally, the relator "relied on outdated country-of-origin charts that do not correspond to the dates of the alleged transactions"; (2) for configurable items, the relator improperly "examined the origin of individual items rather than the end products into which they were 'substantially transformed'"; and (3) for "non-contract, open market items," the

relator "failed to allege any factual or legal basis to conclude that government purchases of [this category of items] from Defendants were in any way unlawful or otherwise improper." Defs.' Mem. at 18.

In response to the defendants' first argument regarding the relator's reliance on outdated quarterly COO charts, the relator explains that he used the "most reliable and complete COO data available." Rel.'s Opp'n at 23.[16] Nonetheless, the defendants contend that the relator's use of quarterly Cisco charts are "temporally disconnected" from the defendants' sales data and cannot be a reliable source to show the defendants sold end products under the GSA FSS contracts from non-designated countries, in violation of the TAA. *See* Defs.' Reply at 9; Rel.'s Opp'n at 21–22. Although the defendants acknowledge that "five transactions, out of 46" refer "to COO charts dated within the same quarter as the transactions," Defs.' Reply at 10 n.6, they point out that otherwise the Third Amended Complaint relies "on outdated and inapplicable COO charts for its analysis of virtually all transactions referenced in the [Third Amended Complaint], including some COO charts that were *more than three years removed* from the date of the transaction alleged in the [Third Amended Complaint]," *id.* at 10 (emphasis in original). As support, the defendants provide a helpful chart "summarizing [the] dated nature of country-of-origin charts alleged by Relator relative to dates of Purchase Orders at issue." Defs.' Mem. at 20 (citing Defs.' Mot., Ex. D, Chart of Time COO Charts and Applicable Purchase Orders, ECF No. 67-6).

The relator does not dispute that "a temporal gap exists between the dates of certain transactions and the applicable COO charts for the products involved in those transactions," but

---

[16] The defendants challenge the relator's reliance on quarterly COO charts, in part, because Cisco's country-of-origin lists are updated weekly. Defs.' Mem. at 2. The relator, however, only received quarterly COO spreadsheets, which were produced in response to the government's CID. Rel.'s Opp'n at 19–20 (citing Cisco Production Letter at 1–2).

rather argues that "some products did not appear on every quarterly Cisco COO chart" and, in any event, "every COO chart on which products involved in sales discussed in the Complaint appeared, those products were <u>always</u> sourced <u>only</u> from non-designated countries." Rel.'s Opp'n at 20–21 (emphasis in original). He further avers that his "allegations are substantiated by the most reliable and complete COO data available for the products at issue – the COO data directly from manufacturer Cisco," and he "has matched this COO data to sales and invoice data provided by Defendants – another presumably reliable source of data." Rel.'s Opp'n at 23. Accepting that the relator conducted the COO analysis using the best source documents made available to him supports a plausible inference that the defendants sold at least some non-compliant end products through their GSA FSS contracts with implied false certifications. *See Iqbal*, 556 U.S at 678.

This conclusion is consistent with that of other cases, in which the relator in this case and another relator have used the same methodology of cross-referencing COO charts with sales data or product lists to allege the defendants in those cases sold non-compliant end products. *See, e.g.*, *United States ex rel. Folliard v. Synnex Corp.* ("*Synnex*"), 798 F. Supp. 2d 66, 80 (D.D.C. 2011) (finding that "facts create a strong inference that a false claim was submitted" where relator compared product and country-of-origin lists); *United States ex rel. Folliard v. CDW Tech. Servs.*, Inc., 722 F. Supp. 2d 20, 23, 29 (D.D.C. 2010) (determining that the relator had sufficiently alleged the existence of a false claim where his complaint was based on a review of vendor products lists, indicating country of origin, alongside a list of 140 end products allegedly sold by defendants); *United States ex rel. Berkowitz v. Automation Aids* ("*Berkowitz*"), No. 13 C 08185, 2017 WL 1036575, at *6 (N.D. Ill. Mar. 16, 2017) (where relator "put[] together his suit by combining product lists (specifying the origin of the products) received in the course of his

ordinary business with data regarding products sold by the Defendants," the court found it could "reasonably infer . . . that the Defendants sold supplies made in non-designated countries to the government") (internal quotation marks and citation omitted). Despite the temporal disconnect of some, or even the majority, of the COO charts, the periods overlap with some purchase orders, as the defendants concede, to support a finding that the relator has plausibly alleged that the instant defendants sold some non-compliant end products, particularly when granting the relator "the benefit of all inferences that can be derived from the facts alleged." *Synnex*, 798 F. Supp. 2d at 81 (quoting *Kowal*, 16 F.3d at 1271).

With respect to the defendants' second falsity argument, the relator has not created such a plausible inference with respect to items Cisco labeled as "configurable options," as opposed to "end products." The parties agree that the defendants sold at least some configurable option items from non-designated countries, but also that the TAA is concerned with the country-of-origin information of "end products," as distinct from "configurable options." *See* Defs.' Mem. at 21 (citing FAR 52.225-6; 19 U.S.C. § 2518(4)(B); 19 C.F.R. § 177.22(a)); Rel.'s Opp'n at 25; *see also* Westcon Contract ¶ 8 (requiring TAA compliance for end products); Comstor Contract ¶ 8 (same). The distinction between "end product" and "configurable option" product is relevant in assessing falsity. Cisco's COO charts, which are attached to the Third Amended Complaint, highlight this distinction and state that Cisco defines a "configurable option" as an item that "is not orderable by itself and may be considered a configurable option of an end product," in which "case, the country of origin of the corresponding end product would apply." Defs.' Mem. at 22 (citing, *e.g.*, Rel.'s COO Source Docs. at 14–16). In other words, "configurable options" are items that have not yet been "substantially transformed" into end products and thus need not individually, for the purposes of government procurement, originate in a designated country.

The defendants provide another helpful chart identifying 22 "configurable option" products included within the Third Amended Complaint's example purchase orders. *See* Defs.' Mot., Ex. E, Chart of Alleged Transactions Involving Configurable Options at 1–2, ECF No. 67-7 (providing chart of 22 products). This list was compiled by reviewing the relator's exhibits, including the Cisco COO charts, and identifying those items marked by Cisco with a "Note 1 designation," which the Cisco COO charts explain were sold as "configurable options." *See* Defs.' Mem. at 22–23.

As to these configurable option items, the relator unpersuasively contends that these items were line items in the defendants' purchase orders, reflecting their sale "on an *a la carte* basis" and "<u>before</u> being incorporated into end products." Rel.'s Opp'n at 25 (emphasis in original). As such, according to the relator, "the items were never 'transformed into a new and different article of commerce,' and therefore, had not been substantially transformed." *Id*. (quoting 19 U.S.C. § 2518(4)(B)). Yet, the relator provides no additional information to support the allegations that the defendants were selling configurable options as end products on an individual basis, and he ignores the possibility, as raised by the defendants, that the government ordered the items "solely for incorporation by Cisco into Cisco end products prior to delivery to the government." Defs.' Reply at 12.

The relator's own exhibits state that a configurable option's country of origin is determined by the end product, *see, e.g.*, Rel.'s COO Source Docs. at 14–16, not the configurable item itself. Without any other factual allegations to show the configurable options items sold by the defendants were never "transformed," the relator has not created an inference that these items needed to comply with the TAA. Thus, with respect to such configurable options items, which may have originated in non-designated countries and appear as individual

line items on the defendants' purchase orders, the relator fails to sufficiently plead the existence

of a false claim due to these items originating in a non-designated country.

Finally, the defendants' last challenge to the falsity prong of the relator's false

certification allegations relates to sixteen products that the defendants sold as "open market"

items on the purchase orders attached to the Third Amended Complaint, which items originated

in non-designated countries and were valued as high as $96,321.96, with some valued at a

fraction of that amount, at only a few thousand dollars or less. *See* Defs.' Mem. at 25–28; *see*

*also* Defs.' Mot., Ex. G, Chart of Alleged Open Market Acquisitions ("Chart of Alleged OM

Acquisitions") at 1, ECF No. 67-9 (providing chart of 16 items compiled from TAC ¶¶ 120, 127–

130, 160, 164, 168, 174 nn.22–23, 176).[17]

The parties dispute the monetary threshold that would require the vendor to ensure TAA-

compliance for these open market items. While the relator argues, based on his understanding of

the FAR's "micro-purchase threshold," that the value of fourteen of the sixteen items required

TAA-compliance, Rel.'s Opp'n at 27, the defendants posit that the relator has not alleged falsity

with respect to any of these open market items because "[n]one of the transactions . . . meet or

exceed" the applicable "TAA Threshold," and therefore "do not trigger applicability of the

TAA's country-of-origin requirements." Defs.' Mem. at 25–26. The relator contends that the

FAR's "micro purchase limit, which has ranged between $2,500 and $3,500 for the relevant time

period," applies to the open market items underlying his claims. TAC ¶ 95. The defendants, on

the other hand, contend that "[t]he dollar threshold necessary to make the TAA applicable to

---

[17]     Two of the sixteen open market transactions identified in the defendants' chart, as underlying the relator's claims, are valued below the micro-purchase threshold, which the relator claims triggers TAA compliance obligations, and, thus, no dispute should exist over whether these two products needed to comply with the TAA. *See* Chart of Alleged OM Acquisitions at 1 (listing value of product PWR-RPS2300 at "$696.00 and the value of product CVR-X2-SFP at "$0"); Rel.'s Opp'n at 27 ("All but two of these sales exceed the micro-purchase limit."). Thus, the falsity of claims submitted for only fourteen of the sixteen open market items are even at issue.

open market items . . . ranged from $191,000 to $204,000 throughout the time period alleged in the [Third Amended Complaint]." Defs.' Mem. at 25 (relying on FAR 25.402(b)), which states "[t]he value of the acquisition is a determining factor in the applicability of trade agreements," as set out in a table summarizing the values triggering various trade agreements); *see also* Defs.' Reply at 15 (citing FAR 25.402(b)); Defs.' Reply at 15 (citing FAR 25.1101(c)(1) for the proposition that the TAA requirement must be inserted "into solicitations and contracts valued at $191,000 or more").

Putting aside this debate about which values trigger TAA-compliance obligations for open market items, the relator's allegations that these open market items needed to comply with TAA country-of-origin requirements fall far short of plausibly establishing falsity. The relator relies for his open market item allegations on specific regulations that are silent regarding TAA-compliance for open market items. For example, the "FAR's only discussion of 'open market' sales appears in FAR 8.402," TAC ¶ 88, which, in a single subsection, permits the government to procure open market items that are "not on the [FSS]" for "administrative convenience … "only if" certain requirements are met, including that "[a]ll applicable acquisition regulations pertaining to the purchase of the items not on the Federal Supply Schedule have been followed (e.g., publicizing (Part 5), competition requirements (Part 6), acquisition of commercial items (Part 12), contracting methods (Parts 13, 14, and 15), and small business programs (Part 19))." FAR 8.402(f)(1). FAR 8.402(f) does not directly refer to the TAA, and nor do any of the other pertinent FAR regulations cited by the relator in the Third Amended Complaint. *See* TAC ¶ 95 (citing FAR 8.405-1(b), which states that "[o]rdering activities may place orders at, or below, the micro-purchase threshold with any [FSS] contractor that can meet the agency's needs."); *id*. (citing FAR 2.101, which "defines the micro purchase limit, which has ranged between $2,500

and $3,500 for the relevant time period."); *see also* FAR 8.401 (defining "ordering activity" as entities that place orders through GSA Schedule contracts).

To be sure, the regulations cited by the relator clearly impose rigorous obligations vendors of open market items that exceed the micro purchase threshold. *See* FAR 8.402(f) (discussing obligations, including those related to publication and competition). Nonetheless, none of these provisions specifically discuss imposing TAA requirements for sales of open market items, which by definition are outside the FSS contract. By contrast, the defendants rely on FAR regulations that explicitly discuss the application of the TAA when the items sold have a value over $191,000 ("TAA-threshold"), *see* Defs.' Mem. at 25 (citing FAR 25.402(b); FAR 25.1101(c)(1)); *see also* Defs.' Reply at 9 (citing FAR 25.402–03), and none of the open market items at issue in the Third Amended Complaint meet or exceed that value. Thus, the legal predicate for the relator's claim—that any products with values over the micro-purchase threshold, set out in FAR 2.101, must originate from designated countries—is legally unsupportable, when FAR 25.402(b) expressly makes acquisitions of open market items subject to the TAA only when the value is over the TAA-threshold.[18] Consequently, the defendants' sale of open market items valued below the TAA-threshold from non-designated countries does not plausibly support the relator's alleged false claims.

---

[18]    Similarly, although the relator cites GSA documents and bid protests discussing vendor obligations triggered when items exceed the micro-purchase threshold, none of these documents explicitly link such obligations to TAA compliance, but instead refers to other requirements, such as surveying contractors and determining price reductions. *See* TAC ¶ 96 (citing *id.*, Ex. 12, GSA Schedules v. Open Market at 13, ECF No. 65-13 (explaining when value of item to be ordered through GSA FSS schedule exceeds micro-purchase threshold but is less than another threshold of $150,000, the entity must take certain actions with respect to surveying contractors and determining if price reduction should be sought)); Rel.'s Opp'n at 26–27 (citing bid protest decisions, none of which mention TAA, for proposition that "The Government Accountability Office – which, among other thing, adjudicates bid protests on federal procurement contracts . . . has repeatedly determined that open market sales must be within the micro-purchase threshold, which has ranged from $2500 to $3500 during the relevant time period").

In sum, the relator has sufficiently alleged falsity as to end products sold by the defendants through their GSA FSS contracts, but falls short in alleging the existence of false claims with respect to configurable options or open market items.

b)      *Materiality*

Even though the relator has crossed the false certification hurdle with respect to end products sold by the defendants, he fails to plead materiality adequately under an FCA presentment claim.  The Supreme Court, in *Escobar*, 136 S. Ct. at 2003, clarified that the standard for pleading materiality under the FCA is "demanding."   There, the Supreme Court considered an appeal from the First Circuit in a *qui tam* suit alleging that the defendant healthcare provider had violated the FCA "under an implied false certification theory of liability" by submitting "reimbursement claims that made representations about the specific services provided by specific types of professionals," while "fail[ing] to disclose serious violations of regulations pertaining to staff qualifications and licensing requirements for these services."  *Id.* at 1998.  The First Circuit had held, *inter alia*, that the healthcare provider's noncompliance with conditions of payment was "sufficient to establish the falsity of a claim for reimbursement," and also that the relator had "properly pleaded that the condition of payment at issue was a material one" because "[t]he express and absolute language of the regulation in question, in conjunction with the repeated references to supervision throughout the regulatory scheme, constitute dispositive evidence of materiality."  *United States v. Universal Health Servs., Inc.,* 780 F.3d 504, 514–517 (1st Cir. 2015), *vacated and remanded*, 136 S. Ct. 1989 (2016) (internal quotation marks and citations omitted).

On appeal, the Supreme Court confirmed "that, at least in certain circumstances, the implied false certification theory can be a basis for liability," but stressed that enforcement of the

"rigorous materiality requirement" for alleging liability under the FCA requires an evaluation of multiple factors. *Escobar*, 136 S. Ct. at 1995–96, 2003. The FCA defines materiality as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Escobar*, 136 S. Ct. at 2002 (quoting 31 U.S.C. § 3729(b)(4)). This definition is derived from "common-law antecedents," *id.* (quoting *Kungys v. United States*, 485 U.S. 759, 769 (1988)), such that, under both the FCA and the common law, "materiality look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation," *id.* at 2002–03 (quoting 26 R. LORD, WILLISTON ON CONTRACTS § 69:12, p. 549 (4th ed. 2003)). This "materiality standard is demanding," as the FCA is not "'an all-purpose antifraud statute' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* at 2003 (quoting *Allison Engine Co., Inc. v. United States ex rel. Sanders* ("*Allison Engine*"), 553 U.S. 662, 672 (2008)). Consequently, materiality "cannot be found where noncompliance is minor or insubstantial." *Escobar*, 136 S. Ct. at 2003. Moreover, it is not "sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.*

In *Escobar*, the Supreme Court enumerated several pertinent factors in determining materiality, stressing that "materiality cannot rest on 'a single fact or occurrence as always determinative.'" *Id.* at 2001 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011)). First, "the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." *Id.* at 2003. Second, "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement" supports a finding that the requirement is material. *Id.* Third, and "[c]onversely, if the

Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Id.* Fourth, "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *Id.* at 2003–04.

In short, the Supreme Court's decision "makes clear that courts are to conduct a holistic approach to determining materiality in connection with a payment decision, with no one factor being necessarily dispositive." *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 109 (1st Cir. 2016). [19] Courts have recognized this approach as requiring a heightened standard for pleading materiality. *See United States ex rel. Petratos v. Genentech Inc.* ("*Petratos*"), 855 F.3d 481, 492 (3d Cir. 2017) ("In holding that [relator] did not sufficiently plead materiality, we now join the many other federal courts that have recognized the heightened materiality standard after [*Escobar*]."); *McBride*, 848 F.3d 1027, 1032 (D.C. Cir. 2017) (recognizing "demanding" standard and affirming grant of summary judgment for defendants on materiality issue (quoting *Escobar*, 136 S. Ct. at 2003)); *United States ex rel. Kelly v. Serco, Inc.*, 846 F. 3d 325, 333 (9th Cir. 2017) (affirming grant of summary judgment to defendants where relator's FCA claim "fail[ed] to meet the rigorous standard for materiality").[20]

---

[19]     On remand, the First Circuit again decided that the defendant's "alleged misrepresentations were material." *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 112 (1st Cir. 2016).

[20]     *Escobar* only considered the post-FERA version of the FCA, without deciding if pre-amendment conduct should be treated differently. *Escobar*, 136 S. Ct. at 1998 n.1 ("Although Universal Health submitted some of the claims at issue before 2009, we assume—as the parties have done—that the 2009 amendments to the False Claims Act apply here. Universal Health does not argue, and we thus do not consider, whether pre–2009 conduct should be treated differently."). While the D.C. Circuit has not expressly resolved this issue, *see McBride*, 848 F.3d at 1031 n. 5 (assuming "that [*Escobar's*] materiality standard applies to the instant dispute," which involved pre-FERA conduct), the Third Circuit has concluded that the *Escobar* materiality standard applies to conduct that occurred before FERA's 2009 amendments, *see United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 763 (3d Cir. 2017) (finding *Escobar's* analysis demonstrates that: "(1) Section [3279](a)(1) has a materiality requirement, even though that requirement has never been expressed in the statute, and (2) the standard used to measure materiality did not change in 2009 when Congress amended the FCA to include a definition of 'material.'"). The

The defendants contend the relator "fails to plead facts plausibly showing that any alleged false claim was 'material' to the government's decision to accept and pay for products it purchased." Defs.' Mem. at 31. In particular, the relator's "exclusive reliance on contractual, statutory, or regulatory obligations does not satisfy the applicable pleading standard for materiality." Defs.' Reply at 22 (citing *Escobar*, 136 S. Ct. at 2001). The requirement of demonstrating materiality would seem especially crucial here where the government declined to intervene after almost five years of investigation, and has also declined to intervene in similar cases brought by this relator alleging similar fraudulent activity by other companies selling products under GSA contracts to the government. *See Petratos*, 855 F.3d 481, 490 (noting, in decision dismissing claims on materiality grounds, that in the "six years" since the relator disclosed evidence of the defendants' "misinformation" to the government, "the Department of Justice has taken no action against [the defendants] and declined to intervene in this suit").

In defense of the materiality element of his claims, the relator primarily relies on *Escobar's* first factor—the government's express condition of payment—even though *Escobar* emphasized that "statutory, regulatory, and contractual requirements are not automatically material, even if they are labeled conditions of payment," 136 S. Ct. at 2001, and that this factor is "not automatically dispositive," *id*. at 2003. The relator contends that "[t]he entire regulatory framework contemplates that, after the initial offers and Trade Agreements Certifications are made, government contracting officers will continue to 'rely on the offeror's certification of end product origin,' unless the offeror says otherwise." Rel.'s Opp'n at 32 (citing FAR 25.501(b)). He bolsters this argument with citations to various regulatory provisions, including: (1) FAR 52.225-6, which requires defendants "to complete the Trade Agreements Certificate" "[b]efore

parties appear to assume that the *Escobar* materiality standard applies to the relator's pre- and post-FERA presentment claims, and that is the assumption applied here.

being permitted to contract with the Government," Rel.'s Opp'n at 31; (2) FAR 52-225-5(b), which requires the defendants continually to certify compliance with the TAA and list non-compliant end products sold to the government, *id.* at 32; and (3) FAR 25.502(b), which requires "government contracting officers" to "generally reject deliveries that include any products from non-designated countries," *id.* at 33.

Other than these regulatory requirements, the relator provides no factual allegations that the "Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement," as set out in *Escobar's* second factor. *Escobar*, 136 S. Ct. at 2003. Instead, the Third Amended Complaint, which was filed after the government was fully informed for years about the relator's allegations regarding the defendants' purported role in the fraudulent scheme, is silent as to whether the government took any action whatsoever against the defendants, or took steps to cancel the FSS contracts at issue upon finding out about submission of claims for non-TAA compliant items, or even sent notices regarding TAA non-compliance to the defendants. Any of those steps by the government could have supported a plausible claim that compliance with regulatory or contractual obligations is material to the government's decision to pay in this case. *Cf., e.g.*, *United States v. Triple Canopy, Inc.*, 857 F.3d 174, 178–79 (4th Cir.), *cert. dismissed*, 138 S. Ct. 370 (2017) (finding, based on allegations of false claims submitted, along with the defendants' "own actions in covering up noncompliance," and the Government's decision "not [to] renew its contract" with the defendant, that the requirements for pleading materiality had been met); *United States ex rel. Scutellaro v. Capitol Supply, Inc.* ("*Scutellaro*"), Civ. No. 10-1094 (BAH), 2017 WL 1422364, at *23 (D.D.C. Apr. 19, 2017) (denying defendant's motion for summary judgment because, *inter alia*, GSA notices to defendant regarding listing of TAA non-compliant

products for sale suffced to raise a genuine issue on materiality as to relator and intervenor government's fraud claims).

Simply put, the relator provides no allegation that meets the examples described by the Supreme Court, including whether "the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated," or "regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated," *Escobar* 136 S. Ct. at 2003–04, as showing the materiality of "the particular statutory, regulatory, or contractual requirement" underlying the relator's claims, *id.* at 2003.

Moreover, the relator "acknowledges that 'exceptions to the rules requiring TAA compliance exist.'" Defs.' Reply. at 22 (quoting Rel.'s Opp'n at 33). Indeed, the Third Amended Complaint quotes a GSA newsletter advising vendors to "*ensure your company is compliant with the TAA requirements*," and stating: "*If problems exist, we will work with you to address compliance issues*." TAC ¶ 83 (emphasis in original) (quoting *id.*, Ex. 11, GSA Steps Issue No. 10 (dated Mar. 2006) ("GSA Steps") at 2, ECF No. 65-12). GSA's expressed willingness to "work with," vendors in order to address compliance issues instead of outright rejecting claims, *see id.* (quoting GSA Steps at 2), certainly shows that the government may continue to make payments even when TAA violations are known.[21]

Without more than citations to the regulatory framework, the relator has failed to show that any alleged false claim was material to the government's decision to pay. *See Escobar*, 136 S. Ct. at 2003 ("A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a

---

[21] To be clear, the mere existence of exceptions in a statutory or regulatory scheme cannot defeat the materiality of the scheme's requirements as a matter of course, since that would mean the exceptions swallow the whole, but the extent of such exceptions is probative of the materiality of specific requirements.

condition of payment."); *see also Knudsen v. Sprint Commc'n. Co.*, Civ. No. 13-04476 (CRB), 2016 U.S. Dist. LEXIS 118438, at *44 (N.D. Cal. Sep. 1, 2016) (finding relator's Second Amended Complaints "only point to the regulations," which "is not sufficient to meet the rigorous standard for pleading materiality"); *United States ex rel. Poehling v. Unitedhealth Grp., Inc. et al.*, Civ. No. 1608697 (MWF) (SSx), 2018 WL 1363487, at *9–10 (C.D. Cal. Feb. 12, 2018) (finding government failed "to adequately plead the materiality requirement of the FCA, as described in *Escobar*," where the government merely alleged "that Defendants were obligated by various regulations and contracts to comply with the Attestation requirements" under Medicare).

In sum, the relator has not alleged sufficient facts to show that any sales of non-TAA compliant products by the defendants were material to the government's decision to pay for Cisco products.

c)      Scienter

While failure to plead sufficiently the materiality of the false certifications underlying the relator's claims warrants dismissal of the presentment claims altogether, this conclusion is also supported by the relator's failure to provide sufficient factual allegations to show scienter, the third element of an FCA presentment claim. *See* 31 U.S.C. § 3729(a)(1)(A). Liability attaches to one who "*knowingly* presents . . . a false or fraudulent claim for payment or approval." *Id.* (emphasis added).

For implied false certification claims, the plaintiff must show that the defendant must have known both "(1) that it violated a contractual obligation, and (2) that its compliance with that obligation was material to the government's decision to pay." *SAIC*, 626 F.3d at 1271. The FCA defines "knowingly" to mean "actual knowledge," "deliberate ignorance of the truth or

falsity of the information," or "reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A); *see also Escobar*, 136 S. Ct. 1989 at 1996; *SAIC*, 626 F.3d at 1266. "Although Congress defined 'knowingly' to include some forms of constructive knowledge, its definition of that term imposes liability for mistakenly false claims only when the defendant deliberately avoided learning the truth or engaged in aggravated gross negligence." *SAIC*, F.3d at 1274–75. Indeed, under the FCA, "reckless disregard is simply a linear extension of gross negligence," *United States v. Krizek*, 111 F.3d 934, 941 (D.C. Cir. 1997) (internal quotation marks and citation omitted), "an extreme version of ordinary negligence," or "'gross negligence-plus,'" *id.* at 942–43 (D.C. Cir. 1997); *see also United States ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 29 (D.C. Cir. 2014); *SAIC*, 626 F.3d at 1269; *United States ex rel. K & R Ltd. P'ship v. Massachusetts Hous. Fin. Agency,* 530 F.3d 980, 983 (D.C. Cir. 2008). For that reason, "innocent mistakes and negligence remain defenses under the Act." *SAIC*, 626 F.3d at 1266 (internal quotation marks and citation omitted).

As with all elements of an FCA claim, allegations of scienter are subject to the particularity requirements of Rule 9(b). *Totten I*, 286 F.3d 542, 551–52. Rule 9(b) permits scienter to be averred generally, but courts require "plaintiffs to plead the factual basis which gives rise to a strong inference of fraudulent intent." *United States ex rel. Tessler v. City of New York* ("*Tessler*"), 712 F. App'x 27, 29 (2d Cir. 2017) (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991)). Indeed, the scienter requirement under the FCA, along with the materiality requirement, is "addressed through strict enforcement," *SAIC*, 626 F.3d at 127071, and is "rigorous," in order to allay "concerns about fair notice and open-ended liability." *Escobar*, 136 S. Ct. 1989 at 2002.

The Third Amended Complaint alleges that the defendants "knowingly" made both express and implied false certifications. *See* TAC ¶¶ 3, 9, 11, 86, 184, 188, 193, 198. The defendants argue that such "conclusory allegations" fail to meet the standards for pleading scienter because the relator has not pled "plausible *facts* from which the Court may reasonably infer knowledge of the falsity." Defs.' Mem. at 29–30 (emphasis in original). In response, the relator emphasizes that "scienter may be pled generally," Rel.'s Opp'n at 28, and, in any event, that the Third Amended Complaint "adequately alleges the scienter element by describing multiple occasions on which Defendants, at the very least, recklessly disregarded the fact that a multitude of products they listed for sale, and sold, to the United States could never be sourced from designated countries, as required," *id.* at 30. Specifically, the relator points out that the Third Amended Complaint "alleges that Defendants violated their TAA obligations for more than a decade; of the $123 million in sales Defendants turned over to the Government, nearly $9 million – more than 7% – involved products that were <u>never</u> TAA-compliant," and "[g]iven the quantities of products Defendants sold in violation of the TAA, the notion that Defendants did not even have reason to know that these products originated in non-designated countries strains credulity." Rel.'s Opp'n at 30 (emphasis in original).

At the outset, the allegations regarding the volume of the products offered for sale by the defendants that were not TAA-compliant appear to include far more than just non-compliant end products, confusingly including both configurable option and open market items for which the relator has failed to plausibly allege falsity. *See supra* Part III.B.2.A.

More importantly, the relator misconstrues the applicable standard. As noted, scienter may be "averred generally" but that does not obviate pleading the underlying facts with particularity. *See Tessler*, 712 F. App'x at 29. Under Rule 9(b), to show scienter by a company,

the relator must plead with particularity facts demonstrating "how the company itself institutionalized and enforced its fraudulent scheme." *Heath*, 791 F.3d at 125. The complaint must "make[] clear, in other words, that corporate levers were pulled . . ." *Id.* In *Heath*, the D.C. Circuit found that the relator had sufficiently alleged that the defendant telecommunications company had "fraudulently overbilled the [Federal Communication Commission's] Universal Service Fund from 1997 through 2009." *Id.* at 117. To demonstrate that the company had "knowingly" engaged in the fraud, the relator's complaint alleged that the company had engaged "in institutionalized training and enforcement failures, . . . compounded by efforts at concealment," *id.* at 122, including by "chos[ing] not to train its employees," *id.* at 117, so that "employees remained ignorant of the requirement" for proper billing, *id.* at 124, despite the company being made aware of the problem and entering a consent decree that required "train[ing of] its employees," *id.* at 125. The Circuit concluded the relator "provides factual specificity concerning the type of fraud, how it was implemented, and the training materials used, all of which is then corroborated by the concrete example of [an] audit documenting the very type of overbilling that follows the complaint's pattern." *Id.* at 126.

Thus, *Heath* illuminates the type of factual allegations necessary to plead that a corporate entity "knowingly" engaged in fraud. The relator, here, has not plead such facts. Merely alleging a time period, the volume of items sold and total sales value involved in the underlying alleged fraud scheme, *see* Rel.'s Opp'n at 30, is not enough to show scienter. Rather, for scienter to be sufficiently plead, the relator must provide details about specific actions taken by the defendant to facilitate and further the alleged fraudulent scheme. *See, e.g., United States ex rel. Groat v. Boston Heart Diagnostics Corp.*, Civ. No. 15-487 (RBW), 2017 WL 6327540, at *8 (D.D.C. Dec. 11, 2017) (finding relator sufficiently plead "knowing violation of [defendant's]

'legal duty to ensure that it is not submitting false or incorrect claims to Government'" where she alleged facts to show that the defendant "engaged in a scheme to encourage non-cardiology physicians to order medically unnecessary tests through a false marketing campaign and pre-printed test requisition forms"); *United States v. DynCorp Int'l*, LLC, 253 F. Supp. 3d 89, 103 (D.D.C. 2017) (finding government adequately alleged scienter for an implied false certification claim based on, *inter alia*, statements by high-level employees of the defendant regarding knowledge of a contractual and regulatory violation).[22]

In addition, the defendants contend that scienter is not sufficiently shown because the defendants "reasonably rel[ied] on Cisco's country-of-origin and 'configurable option' designations when processing orders for government sales." Defs.' Mem. at 30. As support, the defendants rely on *United States ex rel. Folliard v. Govplace* ("*Govplace*"), 930 F. Supp. 2d 123, 137 (D.D.C. 2013), *aff'd sub nom. United States ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19 (D.C. Cir. 2014), where the same relator alleged another company had knowingly submitted false claims in violation of the TAA. There, the court emphasized the "gross negligence-plus" standard in granting summary judgment to the defendant, after determining the relator could not "convince a reasonable jury that [the defendant] 'knowingly' submitted false claims" where the defendants had "reasonably relied on representations made by its IT partner . .

---

[22] The defendants rely on an out-of-circuit case, Defs.' Mem. at 30 (citing *Berkowitz*, 2017 WL 1036575, at *7 (N.D. Ill. Mar. 16, 2017)), in which a relator's complaint was dismissed, under Rules 12(b)(6) and 9(b), upon finding, *inter alia*, the relator's allegations of scienter deficient because "[e]ven if the products sold by the Defendants were made in non-designated countries, there are no particularized allegations on specifically *who* engaged in the fraud, and *what* they did to execute it," and "[m]ost important of all, there are no specific allegations from which to reasonably infer that someone in each company *knew* that the company was selling non-compliant products to the government; that the same someone also *knew* that the [TAA] required that the products be made only in certain countries; and that the same someone *knew* that the submitted claims amounted to an implied certification that the goods were in compliance with all statutory and regulatory requirements," *Berkowitz*, 2017 WL 1036575, at *7 (emphasis in original). In this Circuit, however, FCA claims "need not always allege the specific identity of the natural persons within the defendant corporation," *Heath*, 791 F.3d at 125 (quoting *United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 501 F.3d 493, 509 (6th Cir. 2007)).

. that the products in question were made in TAA-compliant countries," even if the products, in fact, had originated in non-designated countries. *Id.* at 126, 134–37.

Govplace provides only limited help to the defendants here because, in that case, the issue was whether the defendants had reasonably relied on information from a third party regarding country of origin. *Id.* at 134–37. In the instant matter, reasonable reliance only aids the defendants with respect to the open market items and "configurable option" items. The former, by definition and at the values indicated, did not need to originate in a designated country, and the latter, as reflected in Cisco's COO charts, also did not need to originate in a designated country because only "the country of origin of the corresponding end product" applies. *See, e.g.*, Rel.'s COO Source Docs. at 14–16. With respect to the alleged TAA non-compliant end products sold by the defendants, *Govplace* does not support the defendants' position because the Cisco COO charts, as provided by the relator, demonstrate that items sold by the defendants originated in non-designated countries.

The relator meanwhile argues with respect to all the items, the defendants "cannot rely on Cisco to negate the scienter element" because "Cisco never indicated to Defendants that any of the products at issue was TAA-compliant or would become TAA-compliant if/when it was substantially transformed." Rel.'s Opp'n at 29. In support of this proposition, the relator cites *Scutellaro*, 2017 WL 1422364, at *23. That case, however, is only of limited help to the relator given the distinguishable facts. In *Scutellaro*, the relator and intervenor government alleged that the defendants had, at a minimum, acted with deliberate indifference and reckless disregard by selling TAA non-compliant end products after the GSA had sent the defendant specific caution notices about this conduct, plus a supplier's country-of-origin data showed certain items originated from a non-designated country. *Id.* at *23. At the same time, however, the defendant

was "receiving high marks" from GSA on its compliance operations. *Id.* Given these mixed

signals, summary judgment was denied to both parties on the issue of scienter and "whether any

reliance on supplier information was not just unreasonable but was 'gross negligence-plus.'" *Id.*

Thus, neither *Govplace* nor *Scutellaro* has any particular bearing on this Court's conclusion that

the Third Amended Complaint does not meet the rigorous requirements for pleading scienter. [23]

      For the reasons provided above, the realtor has failed to plead the elements required to

allege a presentment claim under the FCA, and, thus, Counts I and II must be dismissed.

### C.    Relator's False Statement Claims

      In addition to alleging violations of the presentment provision of the FCA, the relator

alleges in Counts III and IV that the defendants violated the FCA's false statement provision.

*See* TAC ¶¶ 190–99. Prior to May 20, 2009, the false statement provision created liability for

anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement to

get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2)

(2008). The Supreme Court construed the provision's language "to get" as denoting purpose,

requiring a showing that a defendant intended that the government pay the false claim to be held

liable under section 3729(a)(2). *Allison Engine*, 553 U.S. at 668–69.

      In response to the Supreme Court's decision in *Allison Engine*, Congress enacted the

FERA on May 20, 2009. FERA amended and recodified section 3729(a)(2) as section

3729(a)(1)(B), which now creates liability for anyone who "knowingly makes, uses, or causes to

be made or used, a false record or statement material to a false or fraudulent claim." §

3729(a)(1)(B). FERA "amend[ed] the FCA to clarify and correct erroneous interpretations of the

law" decided in *Allison Engine*, including by eliminating the false statement provision's intent

---

[23]     Similarly, the relator has not plead any facts to demonstrate the defendants were knowingly selling non-compliant items by disregarding open market regulations.

requirement.  S. Rep. No. 111-10, at 10 (2009), *as reprinted in* 2009 U.S.C.C.A.N. 430, 438.

This amended provision was given retroactive effect as if enacted on June 7, 2008, and so applies

to all "claims" under the FCA that are pending on or after that date.  Pub. L. No. 111-21, 123

Stat. at 1625 (codified as 31 U.S.C. § 3729 note).

Here, the relator alleges that the defendants violated the false statement provisions by

"falsely represent[ing] the country of origin of the products that it sold and offered for sale to the

United States Government," both before and after June 7, 2008, in violation of the TAA, TAC ¶¶

193, 198, and supports these claims with the same underlying facts for the presentment clause

claims.  The defendants address Counts III and IV in a single footnote, *see* Defs.' Mem. at 37

n.11, arguing, first, that Counts III and IV should be dismissed pursuant to Rule 12(b)(6) and

Rule 9(b) because, as in Counts I and II, the relator has failed to allege or otherwise specify any

documents constituting "false" records or statements.  *Id.*  Second, the defendants argue that the

relator's claim in Count III under the pre-amendment false statement provision fails to show that

that the false representations were made with the intention that it would result in the

government's payment of a claim.  *Id.*  Finally, the defendants argue that the relator's claim in

Count IV, under the post-amendment false statement provision, fails to allege that the false

statement was "material" to the government's decision to pay a false claim.  *Id.*

With respect to Count III, the relator has provided no particularized allegations regarding

purported fraudulent transactions from before June 7, 2008.  Indeed, the Third Amended

Complaint expressly states that the relator's "analysis begins with sales from 2008" because the

defendants "did not provide sufficient sales data from the earliest years requested."  TAC ¶ 145

n.16.  This is after the government conducted an investigation lasting almost five years.

Moreover, among the 46 example transactions that the relator has presented to allege the

defendants violated the FCA, the earliest took place in September 2008.  *See* TAC ¶ 150.  While a relator may sufficiently plead a "fraudulent scheme with particularity," by "provid[ing] examples of specific false claims submitted to the government pursuant to that scheme," *United States ex rel. Tessler v. City of New York*, Civ. No. 14-6455 (JMF), 2016 WL 7335654, at *2 (S.D.N.Y. Dec. 16, 2016), *aff'd*, 712 F. App'x 27 (2d Cir. 2017) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 510 (6th Cir. 2007)), the specific examples should cover the relevant time period in order to "ensure that defendants have adequate notice of the charges against them to prepare a defense," *see United States v. Toyobo Co.*, 811 F. Supp. 2d 37, 44 (D.D.C. 2011) (quoting *United States ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F.Supp.2d 114, 116 (D.D.C. 2003)).  Thus, with no additional information on sales from before September 2008, Count III fails to meet the particularity requirements of Rule 9(b) and must be dismissed.

Count IV also does not survive for the same reasons that Counts I and II are dismissed. To state a material false statement claim under the post-FERA false statement provision in section 3729(a)(1)(B), "a plaintiff must allege that (1) the defendant made or used a 'record or statement; (2) the record or statement was false; (3) the defendant knew it was false; and (4) the record or statement was 'material' to a false or fraudulent claim." *United States ex rel. Keaveney v. SRA Int'l, Inc.*, 219 F. Supp. 3d 129, 153 (D.D.C. 2016) (quoting *United States ex rel. Hood v. Satory Global, Inc.*, 946 F. Supp. 2d 69, 85 (D.D.C. 2013)).  As detailed, *supra* in Part III.B.2, the relator has failed to meet the standards for pleading materiality and scienter under the FCA, and, thus, Count IV must likewise be dismissed.

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss is **GRANTED**, and the case is dismissed.

A separate Order consistent with this Memorandum Opinion will be filed contemporaneously.

Date: March 31, 2018

_____
BERYL A. HOWELL
Chief Judge