UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA, *ex rel.* BRADY FOLLIARD,<br><br>Plaintiff,<br><br>v.<br><br>COMSTOR CORPORATION, *et al.*,<br><br>Defendant. | Civil Action No. 11-731 (BAH)<br><br>Chief Judge Beryl A. Howell |

## MEMORANDUM OPINION

Brady Folliard brought this action, as a relator, pursuant to the *qui tam* provision of the False Claims Act ("FCA"), 31 U.S.C. § 3730(b)(1), against Westcon Group, Inc. and one of its wholly-owned subsidiaries, Comstor Corporation, alleging that the two defendants sold Cisco Systems, Inc. ("Cisco") products to the United States government, which products originated in non-designated countries, in violation of the Trade Agreement Act ("TAA"), 19 U.S.C. § 2501 *et seq.* Rel.'s Third Am. Compl. ("TAC") ¶¶ 1–2, ECF No. 65. The operative Third Amended Complaint was dismissed, however, for failing to state a claim for relief. The relator now seeks reconsideration of the Court's order, pursuant to Federal Rule of Civil Procedure 59(e), arguing that the dismissal is manifestly unjust. For the reasons explained below, the relator has not shown the need for amendment and the motion is denied.

### I. BACKGROUND

The background of this FCA case is fully set out in the Court's prior opinion. *See United States ex rel. Folliard v. Comstor Corp.*, 308 F. Supp. 3d 56, 63–67 (D.D.C. 2018). Only a brief overview of the relevant facts is necessary here. For two decades, the defendants have supplied

1

the federal government with Cisco products through two Federal Supply Schedule ("FSS") contracts. TAC ¶¶ 7–11. Transactions under each contract must comply with the TAA. *See* TAC ¶ 58; *see also* TAC, Ex. 1, Comstor Contract GS-35F-4389G ("Comstor Contract") at 6, ECF No. 65-2 (requiring compliance with TAA); TAC, Ex. 2, Westcon Contract GS-35F-0563U ("Westcon Contract") at 9, ECF No. 65-3 (same). The TAA and its implementing regulations, the Federal Acquisition Regulations ("FAR"), require that items sold through an FSS contract must be "U.S.-made or designated country end products." TAC ¶ 72 (citing FAR 52.225-5(b)). End products are "those articles, materials, and supplies to be acquired under the contract for public use." *Id.* ¶ 59 (citing FAR 52.225-5(a)). For purposes of the TAA, an end product originates from a country if "it is wholly the growth, product, or manufacture of that country," or if it "has been substantially transformed into a new and different article of commerce" in that country. *Id.* ¶ 77 (citing 19 U.S.C. § 2518(4)(B) and 19 C.F.R. § 177.22(a)). Vendors selling to the federal government through an FSS contract have a continuing obligation to certify compliance with the TAA. *Id.* ¶ 67 (citing FAR 52.225-6(a)). A separate provision of the FAR regulates the federal government's "open-market" purchases, meaning purchases incidental to an FSS contract. Open-market purchases are permissible only upon satisfaction of FAR 8.402(f). *See* TAC ¶¶ 87–88.

The Third Amended Complaint alleged that the defendants falsely certified TAA compliance for Cisco products sold to the federal government and thereby violated the FCA. TAC ¶¶ 143, 182–189, 193, 198. The FCA's presentment provision creates liability for "any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Additionally, the FCA's false statement

2

provision creates liability for "any person who … knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* § 3729(a)(1)(B).[1]

The relator's case "relies on the so-called 'certification theory' of liability, or alternatively 'legally false certification.'" *United States v. Sci. Applications Int'l Corp.* ("*SAIC*"), 626 F.3d 1257, 1266 (D.C. Cir. 2010) (quoting *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001)). Under the certification theory, "a claim for payment is false when it rests on a false representation of compliance with an applicable federal statute, federal regulation, or contractual term. False certifications can be either express or implied. Courts infer implied certifications from silence 'where certification was a prerequisite to the government action sought.'" *Id.* (quoting *United States ex. rel. Siewick v. Jamieson Sci. & Eng'g, Inc.,* 214 F.3d 1372, 1376 (D.C. Cir. 2000)).

The defendants moved to dismiss the Relator's Third Amended Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), on grounds that: (1) the "claims are based on, and substantially similar to, prior public disclosures," for which the relator is not an "original source," and therefore are barred, under 31 U.S.C. § 3730(e)(4), Defs.' Mot. Dismiss Rel.'s TAC ("Defs.' Mot. Dismiss") at 1–2, ECF No. 67; and (2) the Third Amended Complaint did not state a plausible claim for relief under the FCA or satisfy the particularity requirements of Federal Rule of Civil Procedure 9(b), *id.* at 2–3.

The defendants' first argument was unpersuasive. *See Folliard*, 308 F. Supp. 3d at 69–77. The second argument, however, prevailed. A claim under the FCA's presentment provision must

---

[1] In 2009, Congress amended the FCA. *See* Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, 123 Stat 1617, 1621–25 (2009). Relator's claims relate to transactions that occurred on both sides of the FERA amendments. As already observed, neither the Supreme Court nor the D.C. Circuit has ruled whether pre-FERA conduct is subject to FERA's standards. *Folliard*, 308 F.3d at 85 n.20 (citing *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1998 n.1 (2016) and *United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1031 n.5 (D.C. Cir. 2017)). This case presented no occasion for resolving that question because the parties assumed that FERA's amendments apply to pre-FERA conduct. *Id*.

3

allege "that a defendant submitted (1) a claim to the government, (2) that the claim was false, and (3) that the defendant knew that the claim was false.'" *Id.* at 79 (quoting *United States ex rel. Davis v. District of Columbia*, 793 F.3d 120, 124 (D.C. Cir. 2015)). The alleged falsity must have been material to the government's willingness to pay to be actionable under the FCA. *Id.* (citing *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016) ("*Escobar I*") and *SAIC*, 626 F.3d at 1269). Likewise, to succeed on a claim under the FCA's false-statement provision, "a plaintiff must allege that (1) the defendant made or used a record or statement; (2) the record or statement was false; (3) the defendant knew it was false; and (4) the record or statement was material to a false or fraudulent claim." *Id.* at 92 (quoting *United States ex rel. Keaveney v. SRA Int'l, Inc.*, 219 F. Supp. 3d 129, 153 (D.D.C. 2016)).

The Third Amended Complaint adequately pleaded falsity as to some of the defendants' transactions, *id.* at 80–81, but failed to do so as to sales for what the parties call "configurable options," *id.* at 81–82, and as to open-market sales, *id.* at 82–84. Independently, the Third Amended Complaint was dismissed for failing adequately to plead either materiality, *id.* at 84–88, or scienter, *id.* at 88–91.

Now, pursuant to Federal Rule of Civil Procedure 59(e), the relator seeks to alter or amend the order dismissing the Third Amended Complaint, *see* Rel.'s Mot. Alter or Am. J. ("Rel.'s Mot."), ECF No. 77, which motion is ripe for review.

## II. LEGAL STANDARD

Rule 59(e) of the Federal Rules of Civil Procedure authorizes motions "to alter or amend a judgment," FED. R. CIV. P. 59(e), as a "limited exception to the rule that judgments are to remain final," *Leidos, Inc. v. Hellenic Republic*, 881 F.3d 213, 217 (D.C. Cir. 2018). A motion under Rule 59(e) may be granted only in three circumstances: "(1) if there is an intervening

4

change of controlling law; (2) if new evidence becomes available; or (3) if the judgment should be amended in order to correct a clear error or prevent manifest injustice." *Id.* (internal quotations marks omitted); *see also Exxon Shipping Co. v. Baker*, 554 U.S. 471, 486 n.5 (2008) ("Rule 59(e) permits a court to alter or amend a judgment, but it may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." (internal quotation marks omitted)); *District of Columbia v. Doe*, 611 F.3d 888, 896 (D.C. Cir. 2010) ("Rule 59(e) motions are aimed at reconsideration, not initial consideration." (quoting *Nat'l Ecological Found. v. Alexander,* 496 F.3d 466, 477 (6th Cir.2007)). Whether to grant such a motion is within the district court's discretion. *Messina v. Krakower*, 439 F.3d 755, 758 (D.C. Cir. 2006). With these limits, "[r]econsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly." *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 17 (D.C. Cir. 2015) (internal quotation marks omitted).

The relator argues only that the Court's order must be amended to avoid manifest injustice. Rel.'s Mem. Supp. Mot. Alter or Am. J. ("Rel.'s Mem.") at 2, ECF No. 77-1; Rel.'s Reply Supp. Mot. Alter or Am. J. ("Rel.'s Reply") at 1–2, ECF No. 80. "[M]anifest injustice 'does not exist where … a party could have easily avoided the outcome, but instead elected not to act until after a final order had been entered.'" *Leidos*, 881 F.3d at 217 (quoting *Ciralsky v. CIA*, 355 F.3d 661, 665 (D.C. Cir. 2004)). Instead, upsetting a final judgment requires "at least (1) a clear and certain prejudice to the moving party that (2) is fundamentally unfair in light of governing law." *Id.* (internal quotation marks omitted).

## III. DISCUSSION

Neither the law nor the record has changed since the defendants' motion to dismiss was granted. Instead, the relator argues that dismissing the complaint is manifestly unjust because doing so prejudiced the relator's interest in pursuing this action. Rel.'s Mem. at 2; Rel.'s Reply at 2. As the relator views governing law, the Third Amended Complaint adequately pleaded that the defendant falsely certified compliance with conditions of government contracting, that the defendants' false certifications were material to receiving payment, and that the defendant had knowledge of both the falsity and the materiality. For the reasons explained below, none of the defendants' arguments warrant altering or amending the judgment.

### A. Falsity

To begin, the relator's Rule 59(e) motion repeats that the Third Amended Complaint sufficiently pleaded that the defendant falsely certified compliance with the TAA as to (1) so-called configurable options and (2) items sold through open-market transactions.

Neither the TAA nor the FAR refer to "configurable options," a term of Cisco's making to describe items sold to the government specifically for eventual transformation into a different end product. Defs.' Mem. Supp. Mot. Dismiss ("Defs.' Mem.") at 22, ECF No. 67-1. Only during this round of briefing has the relator made his position clear that "configurable options" are in fact "end products," a term actually used in the TAA and the FAR. End products are "articles, materials, and supplies to be acquired under [a] contract for public use." FAR 52.225–5. Under the TAA and the FAR, "end products" sold to the General Services Administration ("GSA") through an FSS contract must originate from either the United States or a designated country unless GSA is notified otherwise. FAR 52-225–5(b); FAR 52.225–6. An end product originates from a country if "it is wholly the growth, product, or manufacture of that country," or

6

if it "has been substantially transformed into a new and different article of commerce" in that country. 19 U.S.C. § 2518(4)(B); *accord* 19 C.F.R. § 177.22(a).

In briefing on the motion to dismiss, the parties disagreed as to whether the Third Amended Complaint adequately had pleaded falsity for so-called configurable options. The parties seemingly agreed that the country of origin for a configurable option is the country in which the substantial transformation will take place, as opposed to the country that manufactured the so-called configurable option. Defs.' Mem. at 23–24; Rel.'s Opp'n Defs.' Mot. Dismiss ("Rel.'s Opp'n") at 23–25, ECF No. 69. Despite that agreement, the relator argued that the defendants had failed to establish that configurable options sold by the defendants actually were substantially transformable into new end products, Rel.'s Opp'n at 23–24, or that if they were, the substantial transformation occurred in the United States or a designated country, *id.* at 24–25. Absent some demonstration of those facts, the relator continued, the Third Amended Complaint could not be dismissed on a Rule 12(b)(6) motion. The defendants countered that the relator had flipped the parties' respective burdens. Defs.' Reply Supp. Mot. Dismiss ("Defs.' Reply") at 11–12, ECF No. 71. The relator's complaint failed to state a claim, the defendants explained, because the relator had not pleaded facts establishing that configurable options either were not sold for eventual incorporation into a new product or were not transformed in the United States or a designated country. *Id.* at 12–14.

Indeed, assuming as the parties did, that a configurable option originates in the country of eventual substantial transformation, the relator had, but failed to satisfy, the burden of pleading plausible facts establishing either that (1) items marked as configurable options were not actually being sold for purposes of later transformation or (2) that the later transformation was occurring neither in the United States nor a designated country. *Folliard*, 308 F. Supp. 3d at 81. Though

the relator's opposition made a conclusory assertion otherwise, the relator never provided "information to support the allegations that the defendants were selling configurable options as end products on an individual basis." *Id.* at 82. Moreover, without any "factual allegations to show the configurable options [] sold by the defendants were never 'transformed,' the relator [had] not created an inference that these items needed to comply with the TAA." *Id.*

The relator's Rule 59(e) motion shifts gears. Despite having previously conceded that a so-called configurable option originates where substantial transformation will occur, the relator now contends that, irrespective of any eventual transformation, configurable options are end products that must themselves comply with the TAA. Rel.'s Mem. at 9–11; Rel.'s Reply at 7–8. New, but previously available, arguments do not allow for relief under Rule 59(e).[2] *See Leidos*, 881 F.3d at 217 ("[M]anifest injustice does not exist where … a party could have easily avoided the outcome, but instead elected not to act until after a final order had been entered."). Therefore, any discussion of the relator's new argument is purely academic.[3]

---

[2] The closest that the relator came to making this argument in opposition to the defendants' motion to dismiss was writing that "[s]ince the non-compliant items at issue in the Complaint were sold to the Government before being incorporated into end products, the items were never 'transformed into a new and different article of commerce,' and therefore, had not been substantially transformed." Rel.'s Opp'n at 25 (emphasis in original). In context, though, that excerpt supported the relator's contention that defendants had failed to establish that configurable options were eventually substantially transformed.

[3] Embarking briefly on that academic endeavor, the relator's new argument is forceful. Under the TAA, an end product originates either from the country in which "it has been substantially transformed into a new and different article of commerce with a name, character, or use distinct from that of the article or articles from which it was so transformed," or from the country of which it is "wholly the growth, product, or manufacture." 19 U.S.C. § 2518(4)(B); *accord* 19 C.F.R. § 177.22(a). The relator now argues that configurable options originate from the country of which they are "wholly the growth, product, or manufacture" irrespective of what transformation awaits. Transformation, the relator concludes, informs the country-of-origin designation only if it precedes the government's purchase. Indeed, "*has been* substantially transformed," as used in 19 U.S.C. § 2518(4)(B), suggests that the relator is right that transformation matters for purposes of country of origin only when transformation precedes the purchase. The remainder of 19 U.S.C. § 2518(4)(B) signals that the substantial-transformation definition for country of origin applies only to an end product built from component parts, but not to the component parts themselves, which under the TAA must originate from the United States or designated country if purchased directly. So, for example, if the government were to purchase an end product made of ten component parts, the end product would originate from the country in which the ten parts were assembled into a new end product. If, however, the government purchased the ten parts individually, each part would originate from the manufacturing country irrespective of the government's ultimate plans for the items and TAA compliance is required for each component. By this reading, the relator was not required to plead that configurable options were either not

8

The relator similarly offers a more expansive argument for the defendants' liability for open-market transactions. FAR 8.402(f) is the only regulatory reference to open-market transactions. FAR 8.402(f)(1) permits the government to make open-market purchase only if "[a]ll applicable acquisition regulations pertaining to the purchase of the items not on the Federal Supply Schedule have been followed (*e.g.*, publicizing (Part 5), competition requirements (Part 6), acquisition of commercial items (Part 12), contracting methods (Parts 13, 14, and 15), and small business programs (Part 19))." The government is relieved of these conditions only when the open-market purchase is "at, or below, the micro-purchase threshold." FAR 8.405-1(b)). Without citation, the relator's Third Amended Complaint alleged that the FAR's open-market conditions include TAA compliance. TAC ¶ 97. The Third Amended Complaint also alleged that the defendants sold open-market items above the micro-purchase limit without fulfilling the obligation to alert the government that the items were not from designated countries, *id.* ¶ 99, thus violating the TAA.

In briefing on the motion to dismiss, the defendants identified a gaping hole in the relator's operative complaint: the complaint did not cite any authority that FAR 8.402(f)'s reference to "acquisition regulations pertaining to the purchase of the items not on the Federal Supply Schedule" includes TAA-compliance. Defs.' Mem. at 25–27. Indeed, FAR 8.402(f) is silent on the topic. Without an obligation to comply with the TAA, the defendants argued, no claim for falsely certifying TAA-compliance could continue. *Id.* at 26. If TAA-compliance is a condition of open-market transactions, the defendants wrote, compliance is required only for open-market purchases that surpass a defined threshold (which ranged from $191,000 to

---

transformable or were not eventually transformed in the United States or a designated country. Nevertheless, the relator's failure to offer this analysis before now is fatal to reconsideration on this pending motion, which, in any event, fails on other grounds.

$204,000 for the relevant period), *id.* at 25–26 (citing FAR 25.402(b)), a threshold that none of the defendants' sales cleared, *id.*

The relator's opposition to the defendants' motion to dismiss offered no useful response. Rather than identifying authority to support either that open-market sales must comply with the TAA, or the circumstances in which that is true, the relator argued that the sales defendants listed as open-market were, in fact, not. Rel.'s Opp'n at 26–27. The relator concluded as much because fourteen of the sixteen open-market sales exceeded the micro-purchase limit. *Id.* This opposition argument missed the point: the relator had failed to plead falsity as to open-market sales because no authority supported that open-market sales must satisfy the TAA. *Folliard*, 308 F. Supp. 3d at 83–84.

Once again, in the Rule 59(e) motion, the relator compensates for prior deficiencies. Now, for the first time, the relator attempts to connect the dots from open-market sales to the TAA.[4] The relator starts with the requirement that "[a]ll applicable acquisition regulations pertaining to the purchase of the items not in the Federal Supply Schedule [must be] followed."

---

[4] The relator also repeats that sales designated as "open-market" were not in fact so because the transactions neither complied with FAR 8.402(f) nor fell below the micro-purchase threshold. Rel.'s Mem. at 12–13. Accordingly, the relator argues, these transactions must be pursuant to an FSS contract and thus subject to the TAA. *Id.* This argument is flawed. Nothing in FAR 8.402(f) indicates that open-market transactions lose that designation for failure to comply with FAR 8.402(f). In any event, if open-market transactions occur outside the established parameters, the government, and not the vendor is at fault. That is clear from FAR 8.402(f)(1)'s conditions. Compliance with Part 5 of the FAR is the first condition and Part 5 "prescribes policies and procedures for publicizing contract opportunities and award information," FAR 5.000, and dictates that "[c]ontracting officers must publicize contract actions in order to increase competition; [and] broaden industry participation in meeting Government requirements …," FAR. 5.002. Likewise, Part 6, the second section with which compliance is required, pertains to "policies and procedures to promote full and open competition in the acquisition process." FAR 6.000. Plainly, the regulations with which FAR 8.402(f)(1) requires compliance speak of government duties. Even more explicitly, FAR 8.402(f) speaks of what a "contracting officer" must do to purchase items incidental to an FSS contract. The same subpart of the FAR makes "the contracting officer, when placing an order …, [] responsible for applying the regulatory and statutory requirements applicable to the agency for which the order is placed … ." FAR 8.404(b)(1). If the relator's objection to the fourteen sales is non-compliance with open-market rules, the government, not the defendants, is the actor at fault. For the same reason, the relator's argument about the materiality of compliance with the conditions of open-market transactions, *see* Rel.'s Mem. at 14–15, is entirely beside the point.

10

Rel.'s Mem. at 13 (citing FAR 8.402(f)(1)). The applicable regulations, the relator continues, include the TAA because the TAA applies to "all acquisitions that are covered by … [t]he World Trade Organization Government Procurement Agreement (WTO GPA)." *Id.* (citing FAR 25.400(a)(1)). In turn, the applicability of the WTO GPA depends on the "estimated value of the acquisition." *Id.* (citing FAR 25.403(b)). When "recurring or multiple awards for the same type of product or products are anticipated, use the total estimated value of these projected awards" over a 12-month period "to determine whether the WTO GPA … applies." *Id.* (citing FAR 25.403(b)(3)). Finally, FAR 25.402(b) supplies the values that trigger TAA applicability. *Id.* at 11–12.

Setting aside the merits of the argument, newly raised arguments do not warrant relief under Rule 59(e). *See Leidos*, 881 F.3d at 217 ("[M]anifest injustice does not exist where … a party could have easily avoided the outcome, but instead elected not to act until after a final order had been entered."). Even if the relator's falsity arguments were procedurally proper, resolution in the relator's favor would not warrant relief. As discussed in the following two sections, the relator has not met the Rule 59(e) standard for materiality or scienter. Those failures are independent bases for denying the pending motion.

### B. Materiality

Next, the relator attacks the Court's materiality ruling. Any alleged fraud on the government is actionable under the FCA only if the fraud was material to the receipt of payment. *Escobar I*, 136 S. Ct. at 1996. Material in this context "means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Applying that definition requires "look[ing] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar I*, 136 S. Ct. at 2002

11

(quoting 26 R. LORD, WILLISTON ON CONTRACTS § 69:12., p. 549 (4th ed. 2003)). Materiality is a demanding standard. *Id.* at 2003; *see also United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1031 (D.C. Cir. 2017) (noting that materiality should be enforced "rigorously").

Many types of factors might exhibit materiality and no "single fact or occurrence" is "always determinative" of materiality. *Escobar I*, 136 S. Ct. at 2001 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011)). Noncompliance with a statutory, regulatory, or contractual condition of payment is relevant, though not dispositive. *Id.* at 2003. A history of the government "consistently refus[ing] to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement" might also be relevant. *Id.* So too might a relator adequately plead materiality by alleging past successful FCA claims for the same alleged violation. *Cf. United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 490 (3d Cir. 2017) ("Nor has [the relator] cited to a single successful claim under § 1395y involving drugs prescribed for their on-label uses or a court decision upholding such a theory."). Noncompliance that undermines "the very essence of the bargain" might also be material. *Escobar I*, 136 S. Ct. at 2003 n.5 (quoting *Junius Constr. Co. v. Cohen*, 257 N.Y. 393, 400 (1931)). At bottom, "courts are to conduct a holistic approach to determining materiality in connection with a payment decision, with no one factor being necessarily dispositive." *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 109 (1st Cir. 2016).

Responding to the defendants' motion to dismiss, the relator argued only that the Third Amended Complaint had pleaded materiality by alleging that the defendants failed to follow the TAA and the FAR, each of which was a condition of payment. Rel.'s Opp'n at 31–32. Materiality requires more. *Folliard*, 308 F. Supp. 3d at 86–87. After *Escobar I*, a relator cannot

12

merely cite a condition with which a defendant failed to comply and make a conclusory statement that that the condition is material. 136 S. Ct. at 2001–04; *see also Petratos*, 855 F.3d at 490 ("The mere fact that § 1395y is a condition of payment, without more, does not establish materiality."). The relator failed to plead, for example, that the government, either in the mine run of cases or in this one, refuses to pay claims once aware of the type of noncompliance alleged, that claims akin to the relator's succeeded in the past, or that the TAA is a statute for which noncompliance is automatically material. Not only did the relator fail to plead any facts signaling materiality, the Third Amended Complaint affirmatively undermined materiality by alleging that the government does not outright refuse payment for TAA non-compliance, but rather views such problems as reason to "*work with [vendors] to address compliance issues*." *Folliard*, 308 F. Supp. 3d at 87 (quoting TAC ¶ 83) (emphasis in original). Without any facts plausibly demonstrating the materiality of the allegedly breached conditions, the Third Amended Complaint was dismissed.

The relator's Rule 59(e) motion retreads worn territory. To begin, the relator insists that TAA-compliance is "inherently material" because Congress passed the TAA, and Congress controls federal spending. Rel.'s Mem. at 4; Rel.'s Reply at 4–5. Yet, a condition's source is separate from its materiality. "A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular *statutory*, regulatory, or contractual requirement as a condition of payment." *Escobar I*, 136 S. Ct. at 2003 (emphasis added); *see also id.* at 2004 ("[I]f the Government required contractors to aver their compliance with the entire U.S. Code and Code of Federal Regulations, then under this view, failing to mention noncompliance with any of those requirements would always be material. The False Claims Act does not adopt such an extraordinarily expansive view of liability."). The relator's Rule 59(e)

13

motion adds that TAA-derived conditions are material because "the TAA serves important United States trade policy interests." Rel.'s Mem. at 3. That may be, but this is the first time that relator has said as much. Irrespective of whether national trade interests would have been enough to show materiality if properly pleaded or argued, raising this point for the first time in a Rule 59(e) motion is too late. *See Leidos*, 881 F.3d at 317.

While relator cites *United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89 (D.D.C. 2017), to show that a violation of regulatory conditions is sufficient for materiality, Rel.'s Reply at 4, the relator misrepresents that opinion. *DynCorp* was explicit that "the FAR's provision for contracting officers to refuse to pay unreasonable costs is one indication that unreasonableness may be material to some claims, but it does not automatically render unreasonableness material in every instance." *Id.* at 101. In that case, the relator alleged that a contractor had claimed costs that were "*significantly* higher than reasonable." *Id.* (emphasis added). "[C]ommon sense" dictated "that the government would not pay claims if it knew that they were outrageously excessive." *Id.* at 103. Regulatory provisions permitting the government to refuse payment on unreasonable charges merely confirmed that. *Id.*

The relator's Rule 59(e) motion makes a couple new points. None, though, merits upsetting the judgment. First, the relator criticizes affording the government's decision against intervention authoritative weight. Rel.'s Mem. at 4–7. To do so, the relator says, undermines the purpose of a *qui tam* action. *Id.* at 4–6; *see also United States v. Brookdale Senior Living Communities, Inc.*, 892 F.3d 822, 836 (6th Cir. 2018) ("If relators' ability to plead sufficiently the element of materiality were stymied by the government's choice not to intervene, this would undermine the purposes of the Act."). Moreover, as the relator contends, some courts have found that the decision against intervention is not probative of materiality because a government

may decline intervention for many reasons. Rel.'s Mem. at 5–6; *see also, e.g.*, *United States ex rel. Atkins v. McInteer,* 470 F.3d 1350, 1360 n.17 (11th Cir. 2006) ("In any given case, the government may have a host of reasons for not pursuing a claim."); *United States ex rel. Chandler v. Cook County,* 277 F.3d 969, 974 n.5 (7th Cir. 2002) ("The Justice Department may have myriad reasons for permitting the private suit to go forward including limited prosecutorial resources and confidence in the relator's attorney.").

Underpinning the relator's argument is the view that "the Government's election not to intervene in this case" was treated here as "a binding concession by the United States that the misconduct Relator alleges is not material to the Government's spending decisions." Rel.'s Mem. at 3. That grossly mischaracterizes the materiality analysis. The Third Amended Complaint, contravening *Escobar I*, relied exclusively on the fact of noncompliance. *See Folliard*, 308 F. Supp. 3d at 87 ("Simply put, the relator provides no allegation that meets the examples described by the Supreme Court … ."); *id.* ("Without more than citations to the regulatory framework, the relator has failed to show that any alleged false claim was material to the government's decision to pay."). Accordingly, the Third Amended Complaint failed to plead materiality. Only as confirmation of the conclusion already reached did the Court note certain undisputed facts, including that the relator had cited the government's stated willingness to continue working with TAA-noncompliant vendors, *id.* at 87, and the extensive investigation that preceded the government's declination decision, *id.* at 86. Moreover, incorporating these circumstances into a holistic materiality analysis was neither clear error nor manifestly unjust. Indeed, the Third Circuit has countenanced doing just that. *See Petratos*, 855 F.3d at 490 (attributing significance for purposes of materiality to the government's six-year investigation preceding a declination decision).

15

Continuing, the relator protests that he should not be faulted for failing to plead "whether the Government … took steps to cancel the FSS contracts at issue upon finding out about submission of claims for TAA non-compliant items, or even sent notice regarding TAA non-compliance to the defendants." *Folliard*, 308 F. Supp. 3d at 86; *see also* Rel.'s Mem. at 6. The relator believes that "essentially requir[ing] Government payors to immediately terminate payments to contractors based solely on relators' allegations of fraud" is manifestly unjust. Rel.'s Mem. at 6–7. Once again, the relator distorts the analysis underlying the determination that the relator failed adequately to plead materiality. As just discussed, the relator failed to plead materiality because the Third Amended Complaint relied exclusively on the fact of noncompliance. *See Folliard*, 308 F. Supp. 3d at 87. In view of that, the passage the relator cites is but one example of a fact that might have helped show materiality if pleaded. *See Escobar I*, 136 S. Ct. at 2003–04 (citing the government's response to known fraud as evidence of whether the alleged fraud is material). Not pleading that the government cancelled defendants' contracts did not doom the relator's Third Amended Complaint. Omitting any fact from which materiality could plausibly be inferred did.

Having failed to show error of any kind as to materiality, the relator's Rule 59(e) motion must be denied.

### C. Scienter

The Rule 59(e) motion must be denied on yet another basis: the relator has not shown that manifest injustice obtains from the Court's scienter ruling.

Implied-false-certification claims under the FCA require that the defendant knowingly violated a contractual obligation and knew that compliance with the obligation was material to payment. *SAIC*, 626 F.3d at 1271. Knowledge includes "actual knowledge," "deliberate

16

ignorance of the truth or falsity of the information," or "reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). The knowledge requirement is enforced strictly "to ensure that ordinary breaches of contract are not converted into FCA liability." *SAIC*, 626 F.3d at 1271.

Complaints alleging FCA violations, as complaints alleging fraud, are subject to Federal Rule of Civil Procedure 9(b)'s pleading standard. *U.S. ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 123 (D.C. Cir. 2015). That rule permits knowledge to be alleged generally, FED. R. CIV. P. 9(b), but does not absolve a relator of pleading "the factual basis which gives rises to a strong inference of fraudulent intent." *United States ex rel. Tessler v. City of New York*, 712 F. App'x 27, 29 (2d Cir. 2017) (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991). When the defendant is a corporation, that inference is created through facts showing that "corporate levers were pulled" to complete the alleged false certification. *Heath*, 791 F.3d at 125. Holding a relator to this "rigorous" requirement allays "concerns about fair notice and open-ended liability." *Escobar I*, 136 S. Ct. at 2002.

The Third Amended Complaint, the relator originally argued, pleaded facts plausibly exhibiting knowledge by alleging that the defendant had sold $9 million worth of TAA non-compliant products and that any vendor dealing in such a quantity must act with at least reckless disregard to remain ignorant of the products' country of origin. Rel.'s Opp'n at 30. Merely citing the volume of sales, however, fell short of the relator's pleading burden because such reliance omits "details about specific actions taken by the defendant to facilitate and further the alleged fraudulent scheme." *Folliard*, 308 F. Supp. at 89 (citing *United States ex rel. Groat v. Boston Heart Diagnostics Corp.*, 296 F. Supp. 3d 155, 164–66 (D.D.C. 2017) and *DynCorp Int'l, LLC*, 253 F. Supp. 3d at 103).

The relator's Rule 59(e) motion argues that Rule 9(b)'s pleading standard was misapplied. To require that a complaint include some details indicative of the defendants' knowledge of the falsity, or the falsity's materiality, according to the relator, is more exacting that Rule 9(b)'s generality standard demands. In support of that conclusion, the relator cites *United States ex rel. Scutellaro v. Capitol Supply, Inc.*, No. 10-cv-1094 (D.D.C.), which case the relator considers similar to this one. Rel.'s Mem. at 15–16.

*Scutellaro*, though, is different. In *Scutellaro*, the relator filed a *qui tam* complaint in June 2010 alleging that the defendant had falsely certified that office products sold to the government met the TAA's country of origin restrictions. Compl. ¶¶ 5, 16, 20, 26–28, *Scutellaro*, No. 10-cv-1094 (D.D.C. June 29, 2010), ECF No. 1. Over the following four years, the Office of Inspector General for GSA sought, through issuance of two administrative subpoenas, country of origin information from the defendant, Capitol Services, Inc. ("CSI"), for items the company sold to the federal government between 2004 and 2011. *See United States v. Capitol Supply, Inc.*, 27 F. Supp. 3d 91, 95, 97 (D.D.C. 2014). Three and a half years after the first subpoena issued, at which time CSI's motions to dismiss were pending, CSI still had not complied with either subpoena. *See generally id.* (ordering summary enforcement of the subpoenas). When the government partially intervened, the complaint alleged CSI's noncompliance. Am. Compl. Partial Intervention ¶¶ 14–15, *Scutellaro*, No. 10-cv-1094 (D.D.C. Apr. 15, 2013), ECF No. 31. A hearing was later held for both a motion to compel CSI's compliance with the subpoenas and CSI's motions to dismiss the relator's complaint and the government's complaint. Transcript of Motions Hearing at 4 ("Transcript"), *Scutellaro*, No. 10-cv-1094 (D.D.C. Mar. 18, 2014), ECF No. 67; *see also* Min. Entry, *United States v. Capitol Supply, Inc.*, 13-mc-373 (D.D.C. Mar. 18, 2014) (documenting motions hearing). At the hearing,

CSI admitted that the company did not retain much of the data the subpoenas sought, which data was necessary for verifying the country of origin for the items CSI sold to the government. *Id.* at 21–24; *see also Capitol Supply, Inc.*, 27 F. Supp. 3d at 103 ("The company's excuse for the gaps in documentation regarding this critical information requested by the subpoenas is that such documentation no longer exists since the 'dynamic' system employed by CSI regularly and routinely over-writes this information as vendors update their product descriptions."). Maintaining such data was an obligation of contracting with the federal government. *Capitol Supply, Inc.*, 27 F. Supp. 3d at 103. Without CSI's compliance with the subpoenas, neither the government nor the relator could "discern country of origin for all of the Fellowes shredders sold by CSI on its government contracts" or "whether CSI was aware at the time of its FSS certification that products were manufactured in noncompliance with the BAA and TAA." *Id.* at 105. Indeed, CSI's efforts to shroud the transactions ran so deep as to require sanctioning CSI and ultimately holding the company in contempt. Order, *Capitol Supply, Inc.*, No. 13-mc-373 (D.D.C. Aug. 6, 2014), ECF No. 27. That CSI failed to maintain data necessary to determine the legality of government transactions, obfuscated as to what data did exist, and resisted turning over any information provided a context suggesting CSI's knowledge of its failure to ensure TAA compliance and of the fraud. Nothing similar has happened in this case.

Rather, Rule 9(b)'s standard was properly applied here. Though Rule 9(b) permits that knowledge be pleaded generally, generally does not mean conclusory. Indeed, "[i]n the context of Rule 9, [generally] is to be compared to the particularity requirement applicable to fraud or mistake. Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade the less rigid—though still operative—strictures of Rule 8." *Ashcroft v. Iqbal*, 556 U.S. 662, 686–87 (2009). Of course, under Rule 8

"'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)); *see also United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923, 936 (D.C. Cir. 2017) ("Together, Rules 8 and 9(b) require a plaintiff to plead the time, place, and content of the fraud and to identify the individuals allegedly involved."). Dismissing a complaint for omitting facts from which a plausible inference of knowledge can be made is wholly consistent with the governing standards.

The relator's failure to meet Rule 59(e)'s standard as to scienter is another independent basis for denying the motion.

## IV. CONCLUSION

For the foregoing reasons, the relator's pending motion for reconsideration is DENIED. An appropriate order consistent with this Memorandum Opinion will be entered.

Date: November 2, 2018

_____
BERYL A. HOWELL
Chief Judge